UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2003 NOV 18 P 3: 43

LINDA AKERMAN,
Plaintiff,

v.

TOWN OF WEST HARTFORD,
Defendant.

CIVIL ACTION NO.
301 CV 554 (SRU)

November 18, 2003

**PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT**
**IN SUPPORT OF MEMORANDUM OPPOSING SUMMARY JUDGMENT**

The plaintiff provides the following statements of material facts in dispute, pursuant to D.Conn.L.Civ.R. 56(a)(2).

## I. PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56(a)(1) STATEMENT

1. Admitted.

2. Admitted.

3. Admitted.

4. Denied in part. The plaintiff began working as a firefighter for the Town of West Hartford in August, 1992 but retired as a result of a work-related disability in September of 2000. See Part II, ¶1 below.[1]

5. Admitted.

6. Denied in part as to the characterization of the CBA grievance process as

---

[1] Given the number of undisputed facts which are actually in dispute and to avoid being excessively redundant, the plaintiff refers the court to the corresponding fact identified in her Rule 56(a)(2) statement and its citations.

"comprehensive." See Def. Ex. 1, the Collective Bargaining Agreement speaks for itself.

7. Denied in part, as to the characterization of the complaint process as "comprehensive." See Def. Ex. 2. The document speaks for itself.

8. Admitted to the extent that it is true that the CBA does not contain a reference to "light duty."

9. Denied in part. While the Personnel Rules may contain certain statements as to leave, the Fire Department also has a practice of providing transfers for some employees. See Part II, ¶¶ 65-71, 77-78 below.

10. Denied. See Part II, ¶¶ 65-71, 77-78 below.

11. Admitted. See, Def. Ex. 2. The document speaks for itself.

12. Denied in part. While there was conflicting testimony as to how the Fire Department handled such requests, there was no evidence that this was a Town-wide policy or practice. See, Part II, ¶ 2 below.

13. Denied in part. See ¶¶ 11, 12, 19, 33-35.

14. Admitted.

15. Admitted in part. See, Part II, ¶ 72 below.

16. Admitted.

17. Admitted in part. See Part II, ¶¶ 73-74 below.

18. Denied. See Part II, ¶¶ 74-79 below.

19. Denied. See Part II, ¶¶ 74-79 below; Def. Ex. 4, p. 25.

20. Admitted

21. Denied. See Part II, ¶¶ 80-81 below.

22. Admitted.

23. Admitted.

24. Admitted in part. Austin stated in his deposition that he had work for the plaintiff. (Def. Ex. 11, pp. 53-54)

25. Admitted in part. The plaintiff and Austin agreed that she would use a combination of sick and vacation time and start work in the office on July 19, 1999. (Def. Ex. 11, pp. 52-53)

26. Admitted in part. Austin later made negative comments regarding the plaintiff's desire to leave the line early in her pregnancy. See Part II, ¶¶ 7, 16 below.

27. Admitted. Def. Ex 14 speaks for itself.

28. Admitted.

29. Denied. See Part II, ¶¶ 11, 19, 33-36 below.

30. Denied. See Part II, ¶¶ 12-15 below.

31. Denied. See Part II, ¶ 11, 19, 33-36 below.

32. Admitted in part. Allyn testified at one point that he spoke with Hurley but admitted that even after he learned the department was hiring outside instructors he took no steps to inform the plaintiff. See Part II, ¶ 49 below.

33. Admitted only to the extent that Cox stated she mostly completed her projects. See Part II, ¶¶ 11, 19, 33-36 below.

34. Denied in part. See Part II, ¶¶ 11, 19, 33-36 below.

35. Denied. See Part II, ¶ 11 below.

36. Denied in part. See Part II, ¶ 11 below.

37. Admitted in part/denied in part. The plaintiff admits that the Town was hiring for those two positions and further admits that she was not qualified as an accountant. However, the plaintiff does not agree that "no other positions existed that were suitable for the plaintiff." See Part II, ¶¶ 12-15, 54-59 below.

38. Admitted in part. See Part II, ¶ 8 below.

39. Admitted in part. See Part II, ¶ 10 below.

40. Denied in part. Def. Exs. 1 and 2 speak for themselves.

41. Admitted in part. See Part II, ¶¶ 12-13 below.

42. Admitted in part. See Part II, ¶17 below.

43. Denied. See Part II, ¶ 17 below.

44. Denied in part. See Part II, ¶ 12-15 below.

45. Admitted in part/denied in part. See Part II, ¶ 15 below.

46. Admitted in part/denied in part. See Part II, ¶¶ 12-15 below.

47. Admitted.

48. Admitted.

49. Admitted in part/denied in part. See Part II, ¶¶ 41-50 below.

50. Admitted in part/denied in part. See Part II, ¶ 19 below.

51. Denied in part. During the conversation with the plaintiff, the plaintiff informed her that she was considering legal action, to which Murray stated, "go ahead," and then stated that she would speak with the Chief about the plaintiff's situation. (Def. Ex. 11, pp. 120, 124)

52. Denied, to the extent that the defendant claims that this conversation occurred immediately after the July 19, 1999 meeting. The plaintiff asked if she could use her

spouse's sick time, in a later meeting with Murray. (Def. Ex. 15, p. 24)

53. Denied in part. Def. Ex. 16 speaks for itself.

54. Admitted.

55. Denied in part. See Part II, ¶¶ 24-27 below.

56. Admitted to the extent that Holly Abery-Wetstone proposed a maternity policy for public safety employees. There is no evidence to support the statement that the Union did not work to negotiate a policy.

57. Denied in part. Holly Abery-Wetstone testified that she was not sure if the resolution passed the Council or was referred for further study and that it was later withdrawn, but since it was done in an executive session, she was not able to discuss the reasons why this happened. (Def. Ex. 17, p. 105)

58. Denied in part. There was only one position discussed at this time and there is no evidence that this position had "just" become available. (Def. Ex. 19; Def. Ex. 15, pp. 30-31)

59. Denied in part. The plaintiff was eventually assigned the "unfunded position." See Part II, ¶ 40 below.

60. Denied in part. It is true that the office assistant rate was $12.15 per hour but there is no evidence that "anyone working in this position" would have been paid that rate.

61. Admitted in part. This temporary position ended because the defendant hired a full-time employee. See Part II, ¶39 below.

62. Denied in part. Def. Ex. 22 speaks for itself. The state did approve the program and the department selected instructors in late fall.

63. Denied to the extent that the defendant claims that all the certifications were going to expire in October. (Def. Ex. 5, p. 35)

64. Denied in part. See, Part II, ¶¶ 48-52 below.

65. Denied in part. The plaintiff testified that the Union was opposed to management "cutting deals" with individual members but provided no evidence that the Union threatened a labor complaint about the issue. See, Part II, ¶¶ 50-52 below.

66. Denied in part. The plaintiff testified that management could not cut a deal with an individual employee. See, Part II, ¶ 51 below.

67. Denied. See, Part II, ¶ 50 below.

68. Denied. The parties disagree as to the necessity of a response by the plaintiff to this e-mail. See, Part II, ¶¶ 44-45 below.

69. Denied. See, Part II ¶ 44 below.

70. Denied. Hurley's alleged belief is directly contradicted by the fact that he spoke with the plaintiff about generalized training after the instructors for the refresher course had been hired. See Part II, ¶ 52 below.

71. Admitted in part. See Part II, ¶¶ 53-54 below.

72. Denied. Although the Personnel Action Forms identify the transfer as having occurred on October 31, 1999, the plaintiff did not start working in the Fire Department until early November 1999 after she was injured during the promotional exam.

73. Denied to the extent that the defendant's suggestion that this was the only project that the defendant could find. See, Part II, ¶¶ 11, 12-15 below.

74. Admitted.

75. Admitted.

76. Admitted. Since the plaintiff was not working in the Fire Department at the time, and given concerns about insurance, she did not have the same access to driving as her fellow candidates, so she had to make special arrangements in order to get practice driving for the exam. (Def. Ex. 11, pp. 147-152)

77. Denied in part. All four candidates took part in the same class, which was rescheduled if one person couldn't attend; however, by virtue of the fact that the other three candidates were on the line, they had access to greater training opportunities than the plaintiff. (Def. Ex. 11, pp. 147-152)

78. Admitted.

79. Admitted to the extent that the plaintiff asked to have a person assist her who would physically lift the jack plates, but whom she would direct as to the location that the jack plate needed to be placed. (Def. Ex. p. 153)

80. Admitted.

81. Denied to the extent that the defendant suggests that an accommodation was eventually granted. (See, Def. Ex. 4, p. 61; Def. Ex. 11, pp 158-159, 176)

82. Admitted.

83. Denied. See, Response to ¶ 81, above.

84. Admitted. Prior to the plaintiff completing her portion of the examination, the ladder truck became inoperable as she was driving it so the test could not be completed. (Def. Ex. 11, p. 173)

85. Admitted in part. The plaintiff followed the normal chain of command for reporting an

on-duty injury. See, Part II, ¶ 61 below.

86. Admitted in part. The plaintiff's physician released her to work four hours per day, however the parties dispute the propriety of requiring the plaintiff to work when she was suffering from a workers' compensation compensable injury and the department has argued that there is no light duty. See Part II, ¶¶ 62-63 below.

87. Admitted in part. The plaintiff was permitted to stay on the promotional list, pending her return to duty, due to the equipment failure that prevented her from completing the test in the first place; this was the specific situation that she thought was fair. (Def. Ex. 13, pp. 262-263)

88. Denied in part. The doctor's records speak for themselves.

89. Denied. The questions raised by the Town in Ex. 26 developed after the plaintiff submitted a follow-up doctor's report in January of 2000. (Def. Ex. 26)

90. Denied in part. The letters included in Def. Ex. 27 do not indicate that, as of February 28, 2000, the plaintiff was "totally disabled from work."

91. Denied in part. The defendant agreed to return the plaintiff's sick time as of December 13, 1999 when the plaintiff's doctor determined that she was totally disabled, not from the point of her injury as was the practice with any workers' compensation related injury. See Part II, ¶ 63 below.

92. Admitted. The plaintiff's retirement was a disability retirement she was forced to take as a result of her back injury. See, Part II, ¶1 below.

93. Admitted to the extent that other firefighters have worked in the office in the past. However, the motivation of the defendant as well as the characterization that this was

done on an "as-needed" basis is a disputed fact between the parties.

94. Denied to the extent that the plaintiff requested a "suitable position;" the plaintiff's CHRO complaint speaks for itself.

95. Admitted. However the parties disagree as to the circumstances surrounding those earlier assignments. See, Part II, ¶¶ 76-79 below.

96. Denied in part. The plaintiff amended her CHRO charge on May 31, 2000 to include claims of retaliation based upon the promotional exam and the treatment of her injury. Due to the CHRO's pleading requirements, the plaintiff was required to reiterate her earlier complaint, prior to amending in the new allegations. See, Part II, ¶¶ 76-79 below.

## II. PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

1. The plaintiff, Linda Akerman worked as a firefighter for the defendant Town of West Hartford from August of 1992 until an injury that she suffered during a promotional exam forced her to retire in September of 2000. (Def. Ex. 11, p. 6; Personnel Action Form of Plaintiff, dated 9/26/00, attached hereto as Pl. Ex. 1)

2. As a firefighter, the plaintiff was also a member of Local 1241 of the International Association of Firefighters (hereinafter "the Union"). (Def. Ex. 1) Additionally, the plaintiff was a classified employee of the Town, and covered by the Town's Personnel Rules. (Def. Ex. 2) The Personnel Rules contain a provision on maternity leave for all classified employees, but neither the CBA nor the Personnel Rules discuss the specific issue of pregnant firefighters. (Def. Ex. 1; Def. Ex. 2)

3. In late June of 1999, the plaintiff learned that she was pregnant and she gave birth to her

son on February 22, 2000. (Def. Ex. 11, p. 43; Def. Ex. 13, p. 265)

4. The plaintiff first notified her lieutenant and then, on July 2, 1999, the plaintiff, along with her husband, Sean Shoemaker, met with Fire Chief William Austin to notify him of the plaintiff's pregnancy. (Def. Ex. 11, p. 43)

5. The plaintiff received a letter dated July 1, 1999 from Deborah Heidenis, Senior Personnel Analyst for the Town, that outlined the Town's view of her rights pursuant to the FMLA and the specific FMLA agreement negotiated with the union. (Def. Ex. 14) This correspondence does not discuss a maternity leave or pregnancy policy. (Def. Ex. 14)

6. During this meeting, the plaintiff gave Austin a note from her obstetrician which stated that she should not be exposed to severe heat and smoke inhalation and requested a transfer to an alternative assignment within the Fire Department. (Def. Ex. 11 p. 76, 85-86, FMLA certification of the plaintiff, attached hereto as Pl. Ex. 2) The plaintiff's doctor did not place any restrictions on the number of hours that the plaintiff was able to work, but only limited her exposure to hazardous conditions. (Pl. Ex. 2)

7. At the July 2nd meeting, the plaintiff and Austin agreed that Akerman would use a combination of sick time and vacation time, for two weeks, before starting work in the office on July 19, 1999. (Def. Ex. 11, pp. 52-53) Austin stated that there was work for her, and the plaintiff described this meeting as "pleasant." (Id., pp. 53-54)

8. The week before the plaintiff was set to start working in the office, she received a message from Austin's secretary, stating that Austin wanted to meet with her on July 19. (Def. Ex. 11, p. 58) Since the plaintiff was supposed to start work on that day, she called Austin, who told her that there was no work and that he wanted to meet to discuss her options

which he described as sick leave, leave without pay or vacation time. (Id., pp. 58, 69)

9. On July 19, 1999, seventeen days after the first meeting with the Chief, the plaintiff, Sean Shoemaker, Pat Brooks, her union president, Assistant Chief Gary Allyn and Austin met. (Def. Ex. 11, p. 87)

10. During this meeting, Austin told the plaintiff that he had not found anything. (Def. Ex. 11, p. 69)

11. Between July 2 and July 19, Austin was out of town for a week or two due to the death of his mother-in-law. (Def. Ex. 6, pp. 30-31) Austin doubted that he had spoken to Chief Hurley about work for the plaintiff, vaguely remembered talking to Gary Allyn about "high priority work" and did not recall speaking to anyone else during this time period. (Def. Ex. 6, pp. 33-34, 40) Two management officials for the Town, Barry Feldman, and Susan Halstad-Farr, could only recall the plaintiff's employment situation coming up in one staff meeting between July and November. (Def. Ex. 11, pp. 99-100; Deposition of Barry Feldman, attached hereto as Pl. Ex. 3, pp. 17, 29-30)

12. During this meeting, the plaintiff expressed the importance of continuing to work while she was physically able, as well as her dislike of taking sick leave when she was not sick. (Def. Ex. 11, pp. 75-6) "I was able to do that work. I was not physically sick. I was not physically injured. I was perfectly capable in every capacity to do a variety of jobs that I know they needed to get done and work that was not getting done." (Id., p. 79) The plaintiff told Austin that there was a real possibility that, due to a prior work-related injury, she may be bedridden by her sixth month, so it was particularly important for her to work early in her pregnancy and not exhaust her sick leave. (Id., p. 75)

13. The plaintiff suggested that she could working on the annual Fire Prevention Week, as well as a number of other possibilities, such as working in the Fire Marshal's office, working on training materials, working on the Life Safety Codes and other projects. (Def. Ex. 11, pp. 54-55, 59)

14. Even Austin conceded that there was work to be done in the Fire Department at the time of the plaintiff's request. "Sure there is work that exists...." (Def. Ex. 6, p. 34) Austin then went on to attempt to explain that he was only focused on finding work that was "a high priority." (Id., pp. 35-37) Austin admitted that when he was talking to Assistant Chief Allyn he used words to the effect of "high priority." (Id., p. 34)

15. Austin conceded that the plaintiff suggested a number of different projects available in the department, but he rejected all of them, claiming that he did not think that anything she suggested was useful. (Def. Ex. 6, pp. 50-52) Austin did discuss the possibility of the plaintiff teaching a training course for firefighters, that was set to begin in October. (Def. Ex. 11, p. 80) Chief Hurley stated that he, Austin and Allyn felt that the plaintiff, with her background as a paramedic, and a teaching certificate, would be ideally suited to assist in teaching the bridge course. (Def. Ex. 5, p. 41)

16. Austin then shocked the plaintiff by stating that the plaintiff was not that pregnant, didn't even look pregnant, and could still work but chose not to. (Def. Ex. 11, pp. 82-86) Austin went on to state that a precedent had been set by a previous pregnant firefighter, Kim Peckham-Cox, who worked into her sixth month of pregnancy before going off the line. (Id., p. 82)

17. The plaintiff then told Austin that she would rescind her request and go back on the line.

(Def. Ex. 11, p. 85) Austin told her that she could not go back on the line because he knew that she was pregnant. (Id., p. 102) When the plaintiff asked Austin why, since he had just indicated that Cox worked to her sixth month, he told her she was a liability. (Id. p. 102) When the plaintiff asked him what he meant by that, Austin stated that now she was off on sick time; she could do whatever she wanted but if she came back and fell off a chair, she could go out on workers' comp; as long as she was home, she was not a liability. (Id.) Austin concedes that he made the reference to the possibility of the plaintiff falling off a chair. (Def. Ex. 6, p. 58) Allyn also confirmed that Austin had made a comment about liability, but he claimed it was made in connection with the plaintiff's doctor's note and not her pregnancy. (Def. Ex. 3, pp. 35-36)

18. The tone of the meeting turned hostile and there was some discussion of the plaintiff seeking legal recourse. (Def. Ex. 13, pp. 373-374) At that point, Austin stated in words to the effect that if the plaintiff were to do that, he would just stop looking for a position. (Id.)

19. After this meeting, the plaintiff, Shoemaker and Brooks went to defendant's Employee Services and spoke with Laurie Murray, the Human Resource Specialist assigned to the fire department, to discuss the plaintiff's situation. (Def. Ex. 11, p. 118; Def. Ex. 15, pp. 20-21) This was the plaintiff's first conversation with Murray, and, other than the pro forma letter outlining her FMLA leave rights, the only contact that the plaintiff had with Employee Services regarding her pregnancy at this point in time. (Def. Ex. 15, p. 29)

20. During this conversation, the plaintiff told Murray that she was going to file a complaint with the Connecticut Commission on Human Rights and Opportunities. (Def. Ex. 11, pp.

123-124, 129)

21. On July 20, 1999, the plaintiff sought the assistance of members of the Town Council. (Def. Ex. 16) In response to this letter, West Hartford Town Manager Barry Feldman told the plaintiff that he would look into her concerns. (E-mail from B. Feldman to the plaintiff dated July 20, 1999, attached hereto as Pl. Ex. 4) Although Council members John Shulansky and Holly Abery-Wetstone responded to the plaintiff, and Abery-Wetstone became actively involved in the plaintiff's situation, Feldman took no action to remedy this situation on behalf of the Town. (Def. Ex. 13, pp. 234-235, 315) Feldman had no idea what the Town's legal obligations were towards pregnant fire fighters, let alone whether they were meeting those obligations with regard to the plaintiff. (Pl. Ex. 3, pp. 10-11, 13, 23) Feldman conceded that the plaintiff's request that she be allowed to work while physically able to did not seem unreasonable. (Id., p. 36)

22. During this time period, former Councilwoman, now Judge Holly Abery-Wetstone – one of the two members of the Town Council who had responded to the plaintiff's July 20, 1999 letter – met with Austin and Feldman to discuss her concerns regarding the plaintiff's treatment. In this meeting, which was also attended by Austin, Hurley, Feldman and Councilman John Shulansky, Austin stated his concern that, "a pregnant firefighter would get light duty in his office, fall of a chair and spend the rest of her pregnancy on workers' comp." (Def. Ex. 17, p. 95) This comment was made after Austin made a similar comment to the plaintiff on July 19, 1999. (Id., p. 72)

23. At this meeting either Austin or Feldman indicated that the plaintiff's personal attitude was the reason for the difficulty in finding a permanent placement for the plaintiff. (Def. Ex.

17, p. 96)

24. Abery-Wetstone explained that she became involved because she was concerned about the reluctance of the female firefighters to reveal their pregnancies and the need for a different kind of duty of pregnant firefighters. (Def. Ex. 17, pp. 76-77, 82) Abery-Wetstone also believed that the Town should have a policy and practice of providing alternative assignment immediately upon a public safety officer's proof that such a position was necessary. (Id., p. 78)

25. One suggestion Abery-Wetstone had was to transfer female firefighters to the fire marshal's office, but this was met with resistance that she met from Austin and Feldman. (Def. Ex. 17, p. 87)

26. As to the parameters of an alternative position, Abery-Wetstone stated that she was okay with some flexibility as to a start date, but that, "I wouldn't anticipate that a woman would have to be on leave without pay for a month. A couple days, maybe, to a week would be appropriate to me. (Def. Ex. 17, pp. 140-141) Additionally, Abery-Wetstone did not think it was reasonable for the alternative assignment to pay less than the employee's regular position. (Id., p. 109)

27. Abery-Wetstone indicated that she felt that the issue was getting the "bum's rush" because additional conditions were placed on the training position and promised that had been made to the plaintiff were not being kept, such as the posting of the training position and the fact that the plaintiff was not permitted to help in the fire prevention activities. (Def. Ex. 17, pp. 116-118) "I was trying to be creative and find something for Linda to do during the pregnancy that would not expose her to potential damage to herself or her fetus

and every idea that I came up with was shot down." (Id., p. 119)

28. Through her efforts to assist the plaintiff, Abery-Wetstone also uncovered the discriminatory animus towards pregnant firefighters inherent in the department and the highest levels of Town government. Abery-Wetstone explained that, with regard to Patricia Forester, another pregnant firefighter, the impression she got from Feldman and Austin was that Forester had faked her injury and gotten full pay and further, that the plaintiff would do the same thing. (Def. Ex. 17. p. 135) According to Abery-Wetstone, "the attitude with Linda was that she was going to pull the same thing that Tricia Forster did, which would be to spend her pregnancy out on comp. (Def. Ex. 17, p. 134) Austin himself made a similar connection with regard to the plaintiff in his deposition. (Def. Ex. 6, pp. 74-75)

29. Kim Cox also testified that she heard that management suggested that Forester's injury was not legitimated. (Def. Ex. 7, p. 16)

30. Austin admitted that he asked the plaintiff at the July 19, 1999 meeting the condition of her back, to which she replied it was 100 percent. (Def. Ex. 6, pp. 74-5) Austin explained that the 100 percent was "**significant in the sense that we had already had one female who had been off the entire time claiming a previous injury, so it was significant to me to ask her that question because I didn't know if that was something she was planning on doing or what**. She said she was 100 percent so that resolved that fear." (Id., p. 76) Austin went on to state:

we had a situation involving another female who says she was pregnant and then immediately said I'm hurt and went off and we never heard from her again for about a year, and she was off that whole time. And it was never a pregnancy, it was a worker's

comp. injury. Okay? So all I'm saying is the following year, or whatever time it was when this question came up involving Linda, you know, my not necessarily fear by my concern was, was she going to try to connect the pregnancy to some previous injury or something; and she said no, I'm 100 percent.

(Id., pp. 76-77)

31. Abery-Wetstone believed that Austin's attitude towards the plaintiff was generally retaliatory towards female firefighters. (Def. Ex. 17, p. 95) According to Abery-Wetstone,

[ ] ....my understanding was also that if she said she would go back on the line, they wouldn't allow her to do so. We had this big debate about, well what if her obstetrician gave her a note saying it's more stress, this whole issue of not working or being shuttle about the town was more stress than being exposed to the heat and the smoke, could she go back on the line." And there was a definitive no from both Hurley and Feldman. So she was stuck in a sort of no-man's land."

(Id., p. 119)

32. After making little headway with regard to the plaintiff, Abery-Wetstone proposed a maternity leave policy for public safety employees. (Def. Ex. 17, p. 75) When she presented the proposed policy to Town Manager Feldman, his response was should such a policy be implemented, all woman would want to stay home and telecommute. (Def. Ex. 17, p. 50) This reaction prompted Abery-Wetstone to object to his comments as sexist. (Id.)

33. After July 19, 1999, Austin admitted that he did not have any specific conversations with Assistant Chief Allyn regarding a position for the plaintiff nor were there any discussions at the Fire Department's internal staff meetings, with Chief Hurley and Fire Marshal Sinsigalli regarding finding the plaintiff a position inside or outside of the department. (Def. Ex. 4, pp. 44-46; Def. Ex. 6, p. 120) Additionally, Austin never spoke with Hurley

or Sinsigalli about work for the plaintiff and Austin did not remember any conversations with Assistant Chief Eric Munsell, the logistics chief regarding work for the plaintiff. (Def. Ex. 6, pp. 33, 42) At his deposition, Austin claimed that he just "knew" that there was no work available in the fire department because he ran the department. (Def. Ex. 6, p. 32)

34. Sinsigalli explained that either Chief Austin or Allyn spoke with him about the plaintiff's placement in his office but that discussion was only one to two weeks prior to her actually working there. (Def. Ex. 9, p. 47)

35. Despite Austin's claim that he was "begging and pleading" for help finding work for the plaintiff, the plaintiff's supervisor in Human Resources Susan Halstead Farr told her that Austin had made one brief announcement that he had a fire fighter looking for work. (Def. Ex. 11, pp. 99-100) Town Manager Barry Feldman only recalled one occasion where Austin made such an announcement at a staff meeting. (Pl. Ex. 3, pp. 17, 29-30) and Laurie Murray stated that no one ever asked her for assistance to find work for the plaintiff. (Def. Ex. 15, p. 29) Murray relied on Austin's representation that there was no work in the fire department for the plaintiff but did not even start looking for an assignment for the plaintiff outside of the fire department until sometime in August. (Def. Ex. 15, pp. 29, 125)

36. On August 6, 1999, Murray did speak with Jim Capodiece, Director of Leisure Services regarding a position for the plaintiff. (Def. Ex. 15, p. 50) At that time, Capodiece did not indicate that anyone else had spoken to him regarding a position for the plaintiff. Murray had a second conversation with Capodiece on August 9, 1999, at which time, he indicated