- 19 -

that someone had discussed the plaintiff in connection with a position in Leisure Services. (Def. Ex. 15, p. 50)

37.  On August 9, 1999, the plaintiff repeated her request for a transfer via an e-mail to Austin. (E-mail of the plaintiff, dated 8/9/99, attached hereto as Pl. Ex. 5)

38.  On August 9, 1999, the plaintiff filed an administrative complaint with the Connecticut Commission on Human Rights and Opportunities and informed the defendant of this fact. (Def. Ex. 11, p. 124)

39.  On August 10, 1999, the defendant offered her a temporary position in the Leisure Services Department for the Town – a department separate and distinct from the Fire Department. (Def. Ex. 11, p. 134)  The plaintiff worked in this temporary position from August 24 until the position was filled with a permanent hire in September of 1999. (Id., p. 135)  During this time, she was paid a significantly lower salary than she had earned as a fire fighter. (Id., p. 144) (Personnel Action Form of plaintiff dated 8/31/99 attached hereto as Pl. Ex. 6)  The plaintiff was also met with some hostility because her presence placed the Elmwood Community Center over budget. (Id., pp. 126-127)

40.  When the Leisure Service position ended, the defendant placed the plaintiff in another temporary position - this time working as a homework coordinator in the Human Services Department but outside of the Fire Department. (Def. Ex. 11, p. 136)  The plaintiff remained in this position until the beginning of November. (Personnel Action Form of the plaintiff dated 9/28/99 attached hereto as Pl. Ex.7; Personnel Action Form of the plaintiff dated 11/5/99 attached hereto as Pl. Ex. 8)

41.  In October, the department decided to offer a EMT/MRT refresher course for its

- 20 -

employees. (Def. Ex. 5, p. 45)  The refresher course was necessary because the "bridge

course," the teaching course Austin discussed at the July 19, 1999 meeting, did not

receive state approval until late fall.  (See e-mail of Laurie Murray attached hereto as Pl.

Ex. 9)  The refresher course, which began in early November was a Fire Department run

EMT/MRT refresher courses necessary to keep certifications current in the meantime.

(Id., p. 45)

42.    The plaintiff was not assigned to teach this course, even though it was similar to the bridge

course Austin had discussed in July, and even though it was undisputed she was qualified

to teach it.   Instead the Town hired non-Town employees, as a result of an advertisement

which was posted in early October.  (See Advertisement attached hereto as Pl. Ex. 10)

Thus even as plaintiff was working outside of the Fire Department at a lower rate of pay –

and still waiting to be transferred back to the Department, the Town was actively

advertising for instructors for a class being taught within the Fire Department.  In fact,

other than one perfunctory email which was sent to the five station houses, at no time did

the defendant inform the plaintiff that the instructor position was available or attempt to

transfer her to that position.  (Def. Ex. 13,  pp. 361-362)

43.    With regard to the bridge course, the Town did not follow its usual procedures for hiring.

Assistant Chief Charles Hurley, who was responsible for training in the fire department,

did not go through employee services to advertise the position, nor did he take steps to

inform any fire fighters who were not on active duty about the position.  (Def. Ex. 5, p.

40)  Instead of speaking with individual members of the fire department about the

position, Hurley e-mailed the five station houses and advertised outside of the department.

(Def. Ex. 5, pp. 40, 48, 53, 56; E-mail of Chief Hurley attached hereto as Pl. Ex. 11)

44.    The plaintiff did not respond to Hurley's October 5, 1999 e-mail because she did not

believe it was directed at her; "They knew I was looking and I was told I was doing this."

(Def. Ex. 11, p. 182; Def. Ex. 13, p. 358) The plaintiff explained that it was her

understanding that, through the e-mail, they were looking for people to work with her.

(Def. Ex. 11, p. 182) More importantly, the plaintiff had been told that the defendant

would be in touch with her once the class got going. (Def. Ex. 11, p. 190, Def. Ex. 13,

371)

45.    The plaintiff was not the only person who believed that she would be assigned to a

teaching position. Abery-Wetstone also testified that she believed that this position was to

be the plaintiff's and that she would not have to apply for it. (Def. Ex. 17, pp. 108, 132)

Additionally, Assistant Chief Allyn indicated that it was his assumption that the plaintiff

would be doing some of the instructing with regard to the bridge course. (Def. Ex. 4, pp.

39-40, 46) And, the Town represented she would tach in their CHRO answer and

Schedule A. (See defendant's answer and Schedule A attached hereto as Pl. Exs. 12 and

13, respectively.)

46.    The Town's Human Services department was no more helpful. Despite the fact that a

teaching post had been discussed as an alternative assignment in July, Murray stated that

no one had approached her about using the plaintiff to teach the refresher course. (Def.

Ex. 15, p. 76)

47.    When asked about the plaintiff's qualifications for teaching the bridge course, Hurley

stated that while he was unsure of whether she had worked as a field paramedic, it would

- 22 -

not have prohibited her from teaching, only who the Town partnered her with. (Def. Ex.
5, p. 93) At the time that the plaintiff was hired, she was a certified EMT and, while
employed by the defendant, the plaintiff received her paramedic certification and is
presently certified as an EMT P, which is the highest level of EMT certification. (Def. Ex.
11, pp. 8-9) Additionally, the plaintiff worked for a brief time for Hunter's Ambulance
while employed by the Town. (Id., p. 18)

48.    Hurley blamed his lack of specific communication with the plaintiff regarding this position

on hostilities with the fire fighter's union. Hurley testified that there were two separate

"MOUS" or "memorandums of understanding" with the union regarding the instructors;

one for all training classes and one for the bridge course, however, both were entered into

well after the refresher course was offered. (Def. Ex. 5, p. 39)

> I don't deny that we had every intention of using Linda Akerman to teach
> classes. But you have to understand, whether it was the bridge course –
> which to me is almost a moot point because she was unavailable to teach
> the bridge course due to the nature of her injury in connection with her
> pregnancy. But with respect to the EMT/MRT refresher, she didn't
> respond in accordance with the MOU, so I had no – I had no other
> alternative but to not use her. And if I would have done that, even if I
> would have said, 'We're going to use Linda Akerman,' without a specific
> response from Linda Akerman the union would have beat me over the head
> with the labor department on that one.

(Def. Ex. 5, pp. 38-40, 64)

49.    However, Hurley did not approach the union leadership about the possibility of the

plaintiff teaching the course as an alternative assignment. (Def. Ex. 5, pp. 47-48) Indeed,

the only person that Hurley did discuss the issue with was Austin. According to Hurley,

Austin told him to adhere to the union's wishes and follow the MOU. (Id., pp. 69-70)

- 23 -

Chief Allyn knew Hurley was advertising the position outside of the department but never discussed it with the plaintiff. (Def. Ex. 4, pp. 50-51)

50.  The MOU regarding training was not signed entered into by the Town and Union until November 30, 1999, nearly two months _after_ the position was posted and filled. (See Pl. Ex. 14; Def. Ex 6, p. 47)

51.  The plaintiff disputed Hurley's characterization of management-labor relations, explaining that there was no rule against fire officials talking to rank and file union members but rather, that the concern the union had was over "cutting deals" with individual members. (Def. Ex. 11, pp. 182-189; Def. Ex. 13, p. 200)

52.  Additionally, at the time, no one ever told the plaintiff that the department could not speak directly with her regarding a placement. (Def. Ex. 11, p. 182) Additionally, despite this alleged prohibition and well _after_ the position was posted, Hurley did speak with the plaintiff in general about coming back to the fire department to do some training but did not mention the refresher course. (Def. Ex. 11, p. 137) According to the plaintiff, this conversation occurred close in time to her transfer back to the fire department. (_Id._, p. 138)

53.  In the end of October, the plaintiff was suddenly and inexplicable moved back to the Fire Department. (Def. Ex. 11, p. 138) "Out of the blue, I was told by Susan, 'I'm sending you back to the fire department. You're done." (_Id._) The plaintiff explained that things were tense with her supervisor, Susan Halstead-Farr because she was missing time due to the promotional exam training she was attending. (Def. Ex. 11, p. 138)

54.  Allyn was told by Austin that the plaintiff was coming back to the Fire Department the

- 24 -

next morning and instructed to find her something to do, and he found her a project in Fire

Marshal Mike Sinsigalli's office. (Def. Ex. 9, p. 56)

55.    At this point, the plaintiff was approximately six months pregnant. (Def. Ex. 4, p. 56; Def.

Ex. 11, p. 82) At the same point in her pregnancy as Kim Peckham Cox, the firefighter

who according to Austin had set a "precedent" in the department. (Def. Ex. 4, p. 56; Def.

Ex. 11, p. 82)

56.    At this time, there was no change in positions or availability of positions in the fire

department. (Def. Ex. 11, pp. 138-139)

57.    Once back at the Fire Department, the plaintiff began working on the "Life Safety Codes"

project. (Def. Ex. 11, p. 139) Sinsigalli explained that this project was something that he

had wanted to do and a project discussed with other officers in the department and that he

used the book to teach one of the certification courses. (Def. Ex. 9, pp. 25, 34-35)

58.    During the time the plaintiff worked on the project, Assistant Chief Allyn routinely asked

the plaintiff how the project was coming and appeared anxious for its completion. (Def.

Ex. 11, p. 140)

59.    According to Sinsigalli, the Life Safety Code project existed as early as July of 1999 and

was not a "make work" project. (Def. Ex. 9, pp. 45-6) Allyn admitted that this project

could have existed in July. (Def. Ex. 4, pp. 57-8) Austin also conceded that the plaintiff

herself had suggested this project at the July 19, 1999 meeting, along with other

suggestions for work during her transfer, and that he knew about the project. (Def. Ex. 6,

pp. 248-249, 252) Austin did finally speak with Sinsigalli in November, who explained the

project and that his response was "Okay, that sound's great." (Def. Ex. 6, p. 247) After

- 25 -

the plaintiff was injured, Sinsigalli finished the Life Safety Codes book, although it took him until 2001. (Def. Ex. 9, pp. 34, 48-49) There is also one book in each fire house. (Def. Ex. 9, p. 35)

60.  While working outside of the fire department, the plaintiff was also training for a promotional exam to the position of driver. (Def. Ex. 11, pp. 147-148)

61.  After the cessation of the exam, the plaintiff notified her commanding officer that she had injured herself while working on a hydrant during the exam. (Def. Ex. 11, pp. 170-171; Def. Ex. 13, p. 261) The plaintiff reported her injury as soon as possible based upon her understanding that an employee was not supposed to leave in the middle of an incident to report an injury. (Def. Ex. 11, p. 172) The plaintiff reported her injury immediately after the test was over. She first reported it to Gary Allyn and then to risk management. (Id., pp. 172-173) The injury the plaintiff suffered became worse and the plaintiff sought worker's compensation for the injury. (Id., pp. 179-180)

62.  Despite having been injured on the job and thus entitled to leave under workers' compensation, and in violation of the Town's past practice, the defendant required the plaintiff to continue to work in a limited capacity – taking the position that the plaintiff could work in a  light duty assignment in the Fire Department.  This directly contradicts their action when  when the plaintiff sought such positions because of her pregnancy restrictions, they claimed that there were no such light duty positions. (Def. Ex. 11, pp. 177-179; Def. Ex. 6, pp. 184-185; Def. Ex. 15, pp. 91-92)

63.  After the plaintiff's union intervened, the plaintiff left work and remained on workers' compensation until the birth of her son. (Def. Ex. 11, p. 179)

- 26 -

64.  As a result of this injury, the plaintiff ultimately accepted disability retirement in

September 2000.  (Pl. Ex. 1)

65.  Despite the objections raised to the plaintiff's request, and the claims that there was no

such thing as light duty work in the fire department, the defendant provided male

firefighters with assignments off the line in the past without requiring them to exhaust all

possible sick and vacation time. (Def., Ex. 6, pp. 288-290, 314-316, 332-335; Def. Ex. 4,

pp. 63-64, 68-69; Def. Ex. 15,  p. 107)

66.  Firefighter Edward Farley was given an accommodation when he was unable to work on

the line, due to bad feet.  (Def. Ex. 4, p. 63; Def. Ex, 6, pp. 314-317; Def. Ex. 15, p. 109)

Farley worked in this position in order to get his final year completed for pension

purposes. (Def. Ex. 4, p. 64)  He retired with 53 vacation days.  (Def. Ex. 15, p. 109)

67.  Brian Tierney was also accommodated with a position in the office as a result of two

broken legs that he suffered.  (Def. Ex. 4, p. 64; Def. Ex. 6, pp. 332-335; Def. Ex. 32)  In

Tierney's case, he was given a five month assignment in the office and, at the time of his

assignment, he had 20 sick days available.  (Letter to B. Tierney dated 12/19/95 attached

hereto as Pl. Ex. 15)  At the time that this assignment ended, he still had 55 vacation days

and 26 1/4 sick days.  (Def. Ex. 32)

68.  After Tierney was scheduled to return to full duty, he was involved in another accident at

home and requested to be permitted to use his vacation days in single increments in order

to protect his leave time, a request that was denied.  (Def. Ex. 32)

69.  John Kupernick, another male firefighter, was allowed to borrow against his sick time in

order to cover for an illness shortly after joining the force.  (Def. Ex. 4, pp. 68-69; Def.

- 27 -

Ex. 6, pp. 92-93)

70.   Allyn claimed that Austin's position is that if a fire fighter has accumulated sick or

vacation time, that must be used before any accommodations are made. (Def. Ex. 4, pp.

67-68) However, Allyn and Austin also claimed that it was department policy that no one

would go without a paycheck. (Def. Ex. 4, p. 69; Def. Ex. 6, pp. 93-95). Both admitted

that this "policy" was not discussed during the meeting with the plaintiff. (Id.) Austin did

not know how much sick time the plaintiff had available when she first requested a

transfer. (Def. Ex. 6, p. 82)

71.   Laurie Murray admitted that she had some concerns that the plaintiff was being treated

fairly than other firefighters, which she may have expressed those concerns with her boss,

Jim Francis. (Def. Ex. 15, p. 113) Murray indicated that her concerns were based on past

practice of the department. (Id., p. 123)

72.   During the plaintiff's tenure, there had been two other fire fighters who had pregnancies,

Kim Peckham-Cox and Patricia Forester. (Def. Ex. 7, p. 7; Affidavit of Patricia Forester

attached hereto as Pl. Ex. 16) Kim Peckham Cox was the first firefighter to get pregnant

and, during her first pregnancy, she hid it until her sixth month, out of fear for her job.

(Def. Ex. 7, pp. 7-8) When she became pregnant for a second time, Austin was Chief.

(Id., pp. 16-19)

73.   During her second pregnancy, Cox dealt mostly with Union President Pat Brooks, who

told her to produce a doctor's note regarding her pregnancy. (Def. Ex. 7, p. 17) Cox did

so, in February. (Id.)

74.   According to Cox, her doctor would not let her work on the line past her sixth month.

- 28 -

(Def. Ex. 7, pp. 19-20)  Cox discussed the status of her transfer with Brooks at least once

each shift, and at one point, Brooks told her that there was no work for her.  (Id., p. 21)

75.    Cox had a concern about being out of work without pay and had been saving her sick time

to use after the birth of her baby, Cox continued to work on the line because she was not

in a financial position to be out of work without pay for the duration of her pregnancy.

(Def. Ex. 7, pp. 23-24)

76.    As late as April 14, the department had not found her work and she was getting close to

the date by which she had to be off the line - May 1.  (Def. Ex. 7, p. 25)  Cox considered

legal action and explained, "I would say so because I was a little hurt and upset.  Because

I know I'm a good worker.  I was, like, "What is the deal?"  (Id. pp. 26-27)

77.    About one week from the May 1 date and at the sixth month of her pregnancy, Cox

learned that she was finally being detailed to a position in the Fire Marshal's office.  (Def.

Ex. 7, p. 28)  Cox stayed on the line for a few days after Austin offered her a position in

the office because it was the end of her shift, and she had child care issues and doctor's

appointments that had already been planned around that schedule, whereas her schedule in

the office would be Monday-Friday.  (Id., p. 40)

78.    When working in the office, Cox did not fill an open position that had been posted within

the town, but rather was just doing work that existed in the office.  (Def. Ex. 7, p. 30; Def.

Ex. 4, p. 18; Def. Ex. 5, pp. 123-124)  Cox's work in the office consisted of inputting

3,000 occupancies, which she had to do twice, inputting the location of hydrants and

comparing the EMT and MRT curriculum.  (Def. Ex. 7, pp. 31-33)  At that time, she

maintained her same salary, accrued benefits and seniority.  (Id.,  p. 29)

- 29 -

79.   Cox explained that her transition to the office was "not smooth." (Def. Ex. 7, pp. 48-51) Cox explained that during the time prior to actually working in the office, she felt anger and frustration with the process and for a time considered legal action. (Def. Ex. 7, p. 49)

80.   Fire Fighter Patricia Forester also became pregnant during Austin's tenure as Chief and requested a transfer and was told that she was not going to be transferred because there was no light duty and she could use sick or vacation time or talk to the Town about other positions. (Pl. Ex. 16, ¶ 5; Def. Ex. 7, p. 14)

81.   Forester continued to work while looking for a transfer but got injured at a fire scene and remained out on workers' compensation and sick leave for the duration of her pregnancy. (Pl. Ex. 16, ¶ 9) Cox stated that she had heard within the firehouse that Forester had faked her injury in order to stay out on workers' compensation, but Cox was at the fire where Forester was injured. (Def. Ex. 7, p. 15)

THE PLAINTIFF,

By: _____
Deborah L. McKenna ct17326
Gregg D. Adler ct05698
Ruth L. Pulda ct05697
Livingston, Adler, Pulda, Meiklejohn
    & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922
(860) 233-9821

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of the foregoing Plaintiff's Local Rule 56(a)(2) Statement In Support of Memorandum Opposing Summary Judgment has been mailed first-class, postage pre-paid on this 18th day of November, 2003 to the following counsel of record:

James M. Sconzo
Kristi E. Mackin
Halloran & Sage, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103-4303

Jennifer Bullock Majewski
Assistant Corporation Counsel
Town of West Hartford
50 South Main Street
West Hartford, CT 06107

Deborah L. McKenna