*01cv554memopp*
*01cv554 memoppl*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

*FILED*

*2003 DEC -1  A 9:57*

*US [illegible]*

| | | |
|---|---|---|
| LINDA AKERMAN,<br>     Plaintiff, | : | CIVIL ACTION NO.<br>301 CV 554 (SRU) |
| | : | |
| v. | : | |
| | : | |
| TOWN OF WEST HARTFORD,<br>     Defendant. | : | |
| | : | November 18, 2003 |

## PLAINTIFF LINDA AKERMAN'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT, TOWN OF WEST HARTFORD'S MOTION FOR SUMMARY JUDGMENT

Submitted by:

Deborah L. McKenna  ct17326
Gregg D. Adler ct05698
Ruth L. Pulda ct05697
Livingston, Adler, Pulda, Meiklejohn
 & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922
(860) 233-9821

- i -

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   **FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    **Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    **The Plaintiff's Pregnancy And Struggle For A Non-Hazardous Assignment** . 3

            1.    **The July 2, 1999 Meeting With Chief Austin** . . . . . . . . . . . . . . . . . . 3

            2.    **The July 19, 1999 Meeting** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

            3.    **The Plaintiff's Continued Attempts To Secure A Non-Hazardous Position Within The Fire Department–Austin's Continued Biases and Ineffective Response** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            4.    **The Defendant's Efforts (Or Lack Thereof )To Transfer The Plaintiff** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            5.    **The Failure To Be Assigned The Refresher Course** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      D.    **The Plaintiff's Return To The Fire Department** . . . . . . . . . . . . . . . . . . . . 16

      E.    **The Town's Requirement That The Plaintiff Work After Her Injury** . . . . . 18

      F.    **The Treatment Of Other Firefighters** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            1.    **The Treatment Of Similarly Situated Male Firefighters** . . . . . . . . . . 19

            2.    **The Treatment Of Other Pregnant Firefighters** . . . . . . . . . . . . . . . . 20

III.  **THE LEGAL STANDARD** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV.   **ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

A.    **Summary Of The Argument** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      B.    **The Plaintiff's Action Is Not Barred By The Collective Bargaining Agreement Or The Town's Personnel Rules** . . . . . . . . . . . . . . . . . . . . . . . 28

- ii -

**C.**  **The Town's Treatment Of The Plaintiff's Request For A Transfer Violated The Affirmative Obligation Placed On Employers By C.G.S.§ 46a-60(a)(7)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **31**

    **1.**  **The Appropriate Legal Analysis For Claims Brought Pursuant To C.G.S.§ 46a-60(a)(7)(E) Makes An Employer's Failure Or Refusal To Make Reasonable Efforts To Find A Suitable Transfer In And of Itself A Violation Of The Act.** . . . . . . . . . . . . . . . . . . . . . . . **31**

    *2.*  **"Reasonable Effort" Pursuant To C.G.S. §46a-60(a)(7)(E) Means A Good-Faith, Thorough, And Conscientious Effort To Find A Suitable Transfer** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

    **3.**  **The Defendant Failed To Make A Reasonable Effort To Transfer The Plaintiff** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

    **4.**  **Even If The Statute Required Evidence That A Suitable Temporary Position Existed, Summary Judgment Must Fail, Because A Reasonable Jury Could Find That Such A Suitable Position Was Indeed Available For The Plaintiff** . . . . . . . . . . . . . . . **36**

**D.**  **The Plaintiff's Discrimination Claims Survive Summary Judgment Because There Is Direct And Circumstantial Evidence Of Discriminatory Animus By The Decision-Makers Toward Pregnant Employees** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **39**

    **1.**  **Legal Standard For Proving Discrimination** . . . . . . . . . . . . . . . . . . . .  **40**

    **2.**  **There Is An Abundance Of Evidence From Which A Reasonable Jury Could Conclude The Plaintiff Was A Victim Of Discrimination** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

**E.**  **The Plaintiff's Retaliation Claims Survive Summary Judgment As The Plaintiff Has Established Sufficient Issues of Disputed Fact** . . . . . . . . . . . .  **45**

    **1.**  **Legal Standard For Retaliation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **45**

    **2.**  **A Reasonable Jury Could Find Ample Evidence Of Unlawful Retaliation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **46**

**V.**  **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **47**

## I.    **INTRODUCTION**

The plaintiff, Linda Akerman, (hereinafter "Akerman" or "plaintiff") is a former West Hartford firefighter, who became pregnant while working for the defendant Town of West Hartford (hereinafter "Town" or "defendant"). In her complaint, the plaintiff alleges that when she sought a transfer to a non-hazardous assignment in the Fire Department during her pregnancy, she became the victim of illegal discrimination by the Town on the basis of her sex and pregnancy, in violation of the Connecticut Fair Employment Practices Act, C.G.S. § 46a-60(a)(1) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a. The plaintiff further alleges that by denying her a transfer, the Town violated the affirmative provisions of C.G.S.§46a-60(a)(7)(E), (hereinafter "§46a-60(a)(7)(E)" or "7(E)") which requires an employer to seek to transfer (a pregnant employee) to a suitable temporary position if her permanent position risks injury to the employee or her fetus and the employee requests such a transfer. Finally the plaintiff alleges that the Town's treatment of her grew worse, in retaliation for her complaint about the Town's unlawful conduct.

The defendant seeks summary judgment on all of these claims, despite the existence of numerous disputed issues of material fact. In so doing, the defendant relies upon an exhaustion argument which is clearly foreclosed by controlling precedent. It then moves on to the merits, and instead of resolving all ambiguities and drawing all inferences in the plaintiff's favor, as is required on summary judgment, the Town distorts the material facts, and resolves all ambiguities and draws all inferences in favor of the Town.

The plaintiff demonstrates below that, based upon the evidence, a reasonable jury could find that the defendant's conduct constituted a clear violation of §46a-60(a)(7)(E). Additionally, on the discrimination claim, a jury could find that there is direct and circumstantial evidence of

- 2 -

animus by the decision-maker towards pregnant employees, particularly those like plaintiff seeking

light-duty work before the sixth month of their pregnancy and that, as a result of this animus, the

plaintiff was treated less favorably than similarly situated male employees. Finally, a jury could

find that the plaintiff was the victim of unlawful retaliation, as the defendant's conduct became

even worse after the plaintiff complained about her discriminatory treatment. For these reasons,

the defendant's motion must be denied.

## II.    FACTS

### A.    Background

The plaintiff, Linda Akerman, began working as a firefighter for the defendant Town of

West Hartford in August of 1992. (Def. Ex. 11, p. 6) The plaintiff continued in this position until

an injury forced her to retire on September 10, 2000.[1] (Pl. Ex. 1) As a firefighter, the plaintiff was

also a member of Local 1241 of the International Association of Firefighters (hereinafter "the

Union"). (Def. Ex. 1) Additionally, the plaintiff was a classified employee of the Town, and

covered by the Town's Personnel Rules. (Def. Ex. 2) The Personnel Rules contain a provision on

maternity leave for all classified employees,[2] but neither the CBA nor the Personnel Rules discuss

---

[1] The defendant incorrectly identifies the plaintiff's retirement date as September 1999. (Def. Brief, p. 2) Following the birth of her son, on February 22, 2000, the plaintiff was placed on worker's compensation due to the injury she sustained while pregnant and was never able to return to the fire department. (Def. Ex. 11, pp. 179-180; Def. Ex. 13, p. 265)

[2] The defendant's claim that the pregnancy leave policy identified in the Personnel Rules was created after Kim Peckham Cox's first pregnancy.... "to let firefighters know their right to transfer" has no basis in fact. The defendant apparently confuses the Personnel Rules with the alleged "policy" discussed by Gary Allyn in his deposition – which he admitted was not really a policy but more of an "arrangement" between the Union and the Town. (Def. Ex.4, p. 22) According to Allyn, this arrangement simply involved the pregnant firefighter providing the Fire Chief with a medical certificate from her doctor and a copy of resume to determine what jobs she could do. (Id., p. 21) While the plaintiff admits that she provided a medical certificate and her resume, there is no agreement between the parties that the arrangement constituted an adequate or complete maternity leave policy, particularly for firefighters seeking to leave the line prior to their sixth month of pregnancy. (Def. Ex. 11, p. 47)

- 3 -

the specific issue of light duty work within the fire department or the accommodation of

firefighters who become pregnant. (Def. Ex. 1; Def. Ex. 2)[3]

B.    The Plaintiff's Pregnancy And Struggle For A Non-Hazardous Assignment

1.    The July 2, 1999 meeting with Chief Austin

In late June of 1999, the plaintiff learned that she was pregnant. (Def. Ex. 11, p. 43)  The

plaintiff first notified her lieutenant and then, on July 2, 1999, she, along with her husband, Sean

Shoemaker, met with Fire Chief William Austin to notify him of the her pregnancy.[4]  (Id., p. 43)

The plaintiff gave Austin a note from her obstetrician which stated that she should not be exposed

to severe heat and smoke inhalation and requested an alternative assignment within the Fire

Department. (Id., pp. 76, 85-86; Pl. Ex. 2)  The plaintiff's doctor did not place any restrictions on

the number of hours that the plaintiff was able to work. (Id.)

During this meeting, Austin stated that he had work for her. (Def. Ex. 11, pp. 53-54)  Then

the plaintiff and Austin agreed that the plaintiff would use a combination of sick time and vacation

time, for two weeks, before starting work in the office on July 19, 1999. (Id., pp. 52-53)[5]

---

[3] The defendant claims as an undisputed fact that "the Department has sought the inclusion of a light duty policy on more than one occasion, but these efforts have been blocked by the Union." (Def. Brief, p. 3)  In support of this assertion, the defendant cites the August 7, 2003 affidavit of Fire Chief William Austin (incorrectly cited as ¶ 7; it is actually ¶ 44)  However, this alleged "undisputed fact" is directly contrary to Fire Chief Austin's first day of deposition testimony, at which time he stated that, "No, light duty did not come up -- I don't remember that even on the radar screen as far as contract negotiations were concerned." (Def. Ex. 6, p. 186) In fact, the Town did tie its agreement to a maternity policy to a union concession for light duty policy for all firefighters. (Def. Ex. 17, pp. 83-84) And, Austin's self-serving affidavit cannot be relied upon where it directly contradicts his deposition testimony. Perma Research & Development Co. v. The Singer Co., 410 F.2d 572, 578 (2d Cir. 1969). Indeed, the contradiction itself constitutes a genuine disputed issue of fact which the Court must consider. Id.

[4] At the time of this meeting, Sean Shoemaker was a Lieutenant in the Fire Department. (Def. Ex. 11, p. 72)

[5] The plaintiff received a letter dated July 1, 1999 from Deborah Heidenis, a Senior Personnel Analyst for the Town that outlined the Town's view of her rights pursuant to the FMLA and the specific FMLA agreement

- 4 -

The week before the plaintiff was to start working in the office, she received a message

from Austin's secretary, stating that Austin wanted to meet with her on July 19. (Def. Ex. 11, p.

58)  Since the plaintiff was supposed to start work on that day, she called Austin, who told her that

there was no work and that he wanted to meet to discuss her options, which he described as sick

leave, leave without pay, or vacation time. (Id., pp. 58, 69)

      2.     The July 19, 1999 Meeting

On July 19, seventeen days after the first meeting with the Chief, the plaintiff, Shoemaker,

Pat Brooks, her union president, Assistant Chief Gary Allyn and Austin met. (Def. Ex. 11, p. 87)

During this meeting, Austin told the plaintiff that he had not found anything.  Actually, the

evidence shows that no agent of the Town even seriously looked for a position for the plaintiff

during this period.[6]

---

negotiated with the union. (Def. Ex. 14)  However, despite the defendant's claims (Def. Brief, pp. 7-8), at no point
in this correspondence does Heidenis discuss a maternity leave or pregnancy policy.

    [6] One of the defendant's crucial and allegedly "undisputed" issues of material fact is that the Chief and
"the people upstairs" (i.e. employee services) were supposedly diligently searching for a position for the plaintiff
between July 2 and July 19.  The undisputed testimony of "the people upstairs" is that prior to the meeting on the
19, **no one from the Fire Department had even approached employee services about locating an alternative
assignment for plaintiff.** (Def. Ex. 15, p. 21)  Indeed, the defendant claims that between the July 2 and July 19
meetings, Austin had been looking for assignments, speaking with his Assistant Chiefs, and discussing the plaintiff
at Wednesday morning staff meetings. (Def. Brief, p. 9)  However, Austin's deposition testimony on these points
directly contradicts the assertions made in his affidavit relied upon by the defendant.  Again, those contradictions
are themselves evidence of disputed issues of fact.  During his deposition, Austin first testified that he had spoken
to his assistant chiefs and other department heads but then clarified the timing of these conversations, stating "You
need to also remember — or you wouldn't know this, but during the time that this was first occurring, my mother-
in-law passed away and I myself was out of town for a few days.  I want to say, I was out of town for about a week
or two.  And so while I was out of Town, unbeknownst to me, I didn't find this out until sometime later, people in
Employee Services were also looking for a position, because I found it ironic that the day I went up and announced
to the people in personnel that I had found a position, they had informed me they had also been looking and they
had found this position, too.  So that was the first I realized there were multiple people looking for positions. (Def.
Ex. 6, pp. 30-31)  Austin further stated, "Right at the beginning of July.  My mother-in-law passed away on July
the 4th or 5th.  It was within a few days after I met -- I was out of town for the funeral." (Id.)  Austin then
admitted that during this time period, he would not have contacted anyone about a position for the plaintiff.  (Id.,
p. 31)

    Austin further testified that, during the period between July 2nd and July 19th, he doubted that he had
spoken to Chief Hurley about work for the plaintiff, that he vaguely remembered talking to Gary Allyn  about "high

- 5 -

The plaintiff expressed the importance of continuing to work while she was physically able, as well as her dislike of taking sick leave when she was not sick. (Def. Ex. 11, pp. 75-76) "I was able to do that work. I was not physically sick. I was not physically injured. I was perfectly capable in every capacity to do a variety of jobs that I know they needed to get done and work that was not getting done." (Id., p. 79)[7] The plaintiff also told Austin that there was a real possibility that, due to a prior work-related injury, she may be bedridden by her sixth month, so it was particularly important for her to work early in her pregnancy and not exhaust her sick leave. (Id., pp. 75, 106) The plaintiff suggested that she could work on the annual Fire Prevention Week,[8] as well as a number of other possibilities, such as working in the Fire Marshals' office, working on training materials, working on the Life Safety Codes and other projects. (Id., pp. 54-55, 59) In his deposition, Austin conceded that the plaintiff suggested a number of different projects available in the department, but he rejected all of them, claiming that he did not think that anything she

---

priority work" and that he did not recall speaking to anyone else during this time period. (Def. Ex. 6, pp. 33-34, 40)

Even his claim to have discussed the plaintiff's situation at "staff meetings" (plural) can't be true. The court can take judicial notice of the fact that, between Friday July 2, 1999 and Monday July 19, 1999 there were 17 days, 2 of which were Wednesdays. Given Austin's testimony that he was out for about a week or two during this time period, under even the most favorable scenario, he would have attended only 1 Wednesday staff meeting. In fact, two management officials for the Town, Barry Feldman, and Susan Halstad-Farr, could only recall the plaintiff's employment situation coming up in one staff meeting between July and November. (Def. Ex. 11, pp. 99-100; Pl Ex. 3, pp. 17, 29-30) Certainly, a reasonable jury could find Austin's claim that he repeatedly raised the plaintiff's employment situation at staff meetings either before or after July 19 to be completely unworthy of belief.

[7] Even Austin conceded that there was work to be done in the Fire Department at the time of the plaintiff's request. "Sure there is work that exists...." (Def. Ex. 6, p. 34) Austin then went on to attempt to explain that he was only focused on finding work that was "a high priority." (Id., pp. 35-37) Austin admitted that when he was talking to Assistant Chief Allyn he used words to the effect of "high priority." (Id., p. 34)

[8] While the program, as it stood in January of 2003 was considered "pretty stock" there was work done in preparation for the presentations, which ran from October and beyond. (Def Ex. 9, pp. 18-19; Def. Ex. 6, p. 87)

- 6 -

suggested was useful. (Def. Ex. 6, pp. 50-52)[9]   Austin did discuss the possibility of the plaintiff

teaching a training course for firefighters, that was set to begin in October.  (Def. Ex. 11, p. 80)[10]

Austin then shocked the plaintiff by stating that she was not "that pregnant," didn't even

look pregnant, and that "she could do the job, but chose not to." (Def. Ex. 11, pp. 82; 84-85)

Austin went on to state that a precedent had been set by a previous firefighter, Kim Peckham-Cox,

who worked into her sixth month of pregnancy before going off the line. (Id., p. 82)[11]  The

plaintiff told Austin that she would rescind her request and go back on the line.  (Id., p. 85) Austin

told her that she could not go back on the line because he knew that she was pregnant.  (Id., p.

102)[12]  When the plaintiff asked Austin why, since he had just indicated that Cox worked to her

sixth month, he told her she was a liability.   (Id., p. 102)  When the plaintiff asked him what he

meant by that, Austin stated that now she was off on sick time; she could do whatever she wanted

but if she came back and fell off a chair, she could go out on workers' comp; as long as she was

home, she was not a liability.  (Id.)  Despite the defendant's attempt to downplay this comment,

---

[9]  While the defendant's brief conceded the plaintiff suggested numerous projects which Austin rejected, noticeably absent from the defendant's recitation of proposed projects by the plaintiff is the actual project she suggested in July and was ultimately assigned in November. (See Def. Brief, p. 11)

[10]  Chief Hurley stated that he, Austin and Allyn felt that the plaintiff, with her background as a paramedic, and a teaching certificate, would be ideally suited to assist in teaching the bridge course. (Def. Ex. 5, p. 41)

[11]  Although Allyn denied that Austin used the word "precedent," Allyn did admit that Austin compared the plaintiff's pregnancy to Cox's. Even Austin conceded that he may have used the term "precedent" in regards to Cox. (Def. Ex. 6, pp. 56-57)

[12]  The defendant's brief claims that, had the plaintiff obtained medical authorization clearing her to return to the line, she would have been able to do so.  Austin's deposition testimony suggests exactly the opposite – had the plaintiff in fact brought in a second note, Austin stated he would have sent her to "see the people upstairs" in Employee Services and suggested that he would not have accepted the veracity of the note. (Def. Ex. 6, pp. 60-61) Allyn also testified, "And she [the plaintiff] testified that she'll go to another doctor and get another note if she had to that would allow her to come back to work. And again Chief Austin refused...." (Def. Ex. 4, p. 35)

- 7 -

Austin concedes that he made reference to the possibility of the plaintiff falling off a chair. (Def. Ex. 6, p. 58)[13] Allyn also confirmed that Austin had made a comment about liability, but he claimed it was made in connection with the plaintiff's doctor's note and not her pregnancy. (Def. Ex. 3, pp. 35-36)

The tone of the meeting turned hostile and there was some discussion of the plaintiff seeking legal recourse. (Def. Ex. 13, pp. 373-374) Austin stated in words to the effect that if the plaintiff were to do that, he would just stop looking for a position. (Id.)

 3.  The Plaintiff's Continued Attempts To Secure A Non-hazardous Position
 Within The Fire Department--Austin's Continued Biases and Ineffective
 Response

After the July 19th meeting, the plaintiff, Shoemaker and Brooks went to defendant's Employee Services and spoke with Laurie Murray, the Human Resource Specialist assigned to the fire department, to discuss the plaintiff's situation. (Def. Ex. 11, p. 118; Def. Ex. 15, pp. 20-21)[14] This was the plaintiff's first contact with Employee Services in regard to her pregnancy, other than the pro forma letter outlining her FMLA leave rights. (Def. Ex. 11, p. 119) During this conversation, the plaintiff told Murray that she was going to file a complaint with the Connecticut Commission on Human Rights and Opportunities. (Def. Ex. 11, pp. 123-124, 129) On July 20,

---

[13]  The defendant attempts to contradict this testimony by citing Austin's affidavit rather than his deposition in which he suggests that the liability comment was made in connection with permitting the plaintiff to work on the line after she submitted a doctor's note removing her from the line. (Def. Ex. 3, ¶ 36)  Again, this demonstrates the disputed issues of material fact in the defendant's own evidence.

[14]  While it is true that the plaintiff was upset following the meeting with Austin, the defendant attempts to misconstrue this as "upset because the Chief would not create a position for her." (Def. Brief, p. 12)  As the plaintiff testified, the reason that she was upset was because she knew there was work available, she identified viable projects, she was aware of others who had worked in the office and she felt she was being treated differently. (Def. Ex. 11, pp. 87, 117-119, 130)

- 8 -

1999, the plaintiff sought the assistance of the Town Council. (Def. Ex. 16)[15]  In response to this

letter, Town Manager Barry Feldman told the plaintiff that he would look into her concerns. (Pl.

Ex. 4)  Two Council members, John Shulansky and Holly Abery-Wetstone, who is now a

Connecticut Superior Court Judge,  responded to the plaintiff. (Def. Ex. 13, pp. 234-235)  Abery-

Wetstone became actively involved in the plaintiff's situation, but Feldman took no action to

remedy this issue on behalf of the Town. (Id., pp. 234-235, 315)[16]

During this time period, former Abery-Wetstone met with Austin and Feldman to discuss

her concerns regarding the plaintiff's treatment.  In this meeting, which was also attended by

Austin, Hurley, Feldman, and Councilman John Shulansky, Austin stated his concern that, "a

pregnant firefighter would get light duty in his office, fall of a chair and spend the rest of her

pregnancy on worker's comp." (Def. Ex. 17, p. 95) This comment was made after Austin made a

similar comment to the plaintiff on July 19, 1999.  (Id., pp. 71-72)[17]

Abery-Wetstone testified at her deposition that she became involved with the plaintiff's

---

[15] Once more, the defendant attempts to mis-characterize the plaintiff's position.  As the July 20, 1999 letter shows, at no point did she demand that the Department create a position for her.  Rather, she identified her request for a transfer, the fact that the department has sought light duty in the past - which suggested that work was available and the accommodation of other firefighters as reasons for her concern over her treatment. (Def. Ex. 16)

[16] In its brief, the defendant claims that, after discussion with the Chief and council (sic), Feldman took no action because it became apparent that the Department was following its legal obligations towards the plaintiff. (Def. Brief, p. 13)  However, when deposed, Feldman made it abundantly clear that, although he was Town Manager and the person entrusted with ensuring the Town's compliance with anti-discrimination laws, he had no idea what the Town's legal obligations were towards pregnant firefighters, let alone whether they were meeting those obligations with regard to the plaintiff. (Pl. Ex. 3, pp. 10-11, 13, 23)   Feldman did concede that the plaintiff's request that she be allowed to work while physically able to did not seem unreasonable. (Pl. Ex. 3, p. 36)

[17] At this meeting, either Austin or Feldman concocted another excuse for its failure to find a spot for plaintiff – supposedly it was her "personal attitude." (Def. Ex. 17, p. 96)  The defendant no longer relies on this shifting explanation as one of its excuses for inaction.

- 9 -

situation because she was concerned about the reluctance of the female firefighters to reveal their pregnancies and the need for a different kind of duty for pregnant firefighters. (Def. Ex. 17, pp. 76-77, 82)[18]  Abery-Wetstone also believed that the Town should have a policy and practice of providing alternative assignment immediately upon a public safety officer's proof that such a position was necessary. (Id., p. 78)[19]  "I was trying to be creative and find something for Linda to do during the pregnancy that would not expose her to potential damage to herself or her fetus and every idea that I came up with was shot down." (Id., p. 119)[20]

Through her efforts to assist the plaintiff, Abery-Wetstone also uncovered the discriminatory animus towards pregnant firefighters inherent in the department and the highest levels of Town government. Abery-Wetstone explained that, with regard to Patricia Forester, another pregnant firefighter, the impression she got from Feldman and Austin was that Forester had faked her injury and gotten full pay and further, that the plaintiff would do the same thing. (Def. Ex. 17. p. 135)  According to Abery-Wetstone, "the attitude with Linda was that she was going to pull the same thing that Tricia Forester did, which would be to spend her pregnancy out

---

[18] One suggestion Abery-Wetstone had was to transfer female firefighters to the fire marshal's office, but this was met with resistance from Austin and Feldman. (Def. Ex. 17, p. 87)  Even the defendant conceded that there was always a need for firefighter assistance with fire inspections, however, this was not a function that the plaintiff could perform at the time of her request due to the additional training requirements -- training requirements which are routine for everyone above the rank and file firefighter.  Moreover, there was no prohibition on a rank and file member from being certified. (Def. Ex. 9, pp. 15-16)

[19] As to the parameters of an alternative position, Abery-Wetstone stated that she was okay with some flexibility as to a start date, but that, "I wouldn't anticipate that a woman would have to be on leave without pay for a month.  A couple days, maybe, to a week would be appropriate to me. (Def. Ex. 17, pp. 140-141)  Additionally, Abery-Wetstone did not think it was reasonable for the alternative assignment to pay less than the employee's regular position. (Def. Ex. 17, p. 109)

[20] Abery-Wetstone indicated that she felt that the issue was getting the "bum's rush" because additional conditions were placed on the training position and promises that had been made to the plaintiff were not being kept, such as the posting of the training position and the fact that the plaintiff was not permitted to help in the fire prevention activities. (Id., pp. 116-118)

- 10 -

on comp. (<u>Id.</u>, p. 134)  Kim Cox also testified that she heard that management suggested that

Forester's injury was not legitimate.  (Def. Ex. 7, p. 16)

Austin made a similar connection with regard to the plaintiff in his deposition. (Def. Ex. 6,

pp. 74-75) Austin admitted that he asked the plaintiff at the July 19, 1999 meeting the condition of

her back, and she replied it was 100 percent.  (<u>Id.</u>)  Austin explained that the 100 percent was:

> **significant in the sense that we had already had one female who had been off
> the entire time claiming a previous injury, so it was significant to me to ask
> her that question because I didn't know if that was something she was
> planning on doing or what.**  She said she was 100 percent so that resolved that
> fear.

(<u>Id.</u>, p. 76) Austin further stated:

> we had a situation involving another female who says she was pregnant and then
> immediately said I'm hurt and went off and we never heard from her again for about
> a year, and she was off that whole time.  And it was never a pregnancy, it was a
> worker's comp. injury.  Okay?  So all I'm saying is the following year, or whatever
> time it was when this question came up involving Linda, you know, my not
> necessarily fear by my concern was, was she going to try to connect the pregnancy
> to some previous injury or something; and she said no, I'm 100 percent.

(<u>Id.</u>, pp. 76-77)

Abery-Wetstone believed that Austin's attitude towards the plaintiff was generally

retaliatory towards female firefighters.  (Def. Ex. 17, p. 95)  According to Abery-Wetstone,

> [ ] ....my understanding was also that if she said she would go back on the line, they
> wouldn't allow her to do so.  We had this big debate about, well what if her
> obstetrician gave her a note saying it's more stress, this whole issue of not working
> or being shuttle about the town was more stress than being exposed to the heat and
> the smoke, could she go back on the line."  And there was a definitive no from both
> Hurley and Feldman.  So she was stuck in a sort of no-man's land."

(<u>Id.</u>, p. 119)

After making little headway with regard to the plaintiff, Abery-Wetstone proposed a

- 11 -

maternity leave policy for public safety employees.[21]  (Def. Ex. 17, p. 75)  When she presented the

proposed policy to Town Manager Feldman, his response was, should such a policy be

implemented, all woman would want to stay home and telecommute.  (Id., p. 50)  This reaction

prompted Abery-Wetstone to object to his comments as sexist.  (Id.)

   4.   The Defendant's Efforts (Or Lack Thereof )To Transfer The Plaintiff

  Following the July 19th meeting, there was no attempt from within the Fire Department to

transfer the plaintiff to a position within the department.  After this time, Austin admitted that he

did not have any specific conversations with Chief Allyn regarding a position for the plaintiff nor

were there any discussions at the Fire Department's internal staff meetings (which were attended

by Chief Hurley and Fire Marshal Sinsigalli), regarding finding the plaintiff a position inside or

outside of the department.  (Def. Ex. 4, pp. 44-46; Def. Ex. 6, p. 120)  Additionally, Austin never

spoke with Hurley or Sinsigalli[22] about work for the plaintiff and  Austin did not recall any

conversations with Assistant Chief Eric Munsell, the logistics chief, regarding work for the

plaintiff. (Def. Ex. 6, pp. 33, 42)[23]

  Moreover, despite Austin's claim that he was "begging and pleading" for help finding work

for the plaintiff, the plaintiff's supervisor in Human Resources Susan Halstead Farr told her that

---

  [21]  While the defendant cites as a fact that the Union and the Town Council opted not to adopt a pregnancy policy, from 1999 until sometime in 2002, the firefighters were working without any contract.  (Def. Ex. 6, p. 47) Therefore, little relevance can be taken from this alleged "fact."

  [22]  Sinsigalli explained that either Austin or Allyn spoke with him about the plaintiff's placement in his office but that discussion was only one to two weeks prior to her actually working there.  (Def. Ex. 9, p. 47) Interestingly, Austin testified that Munsell had previously identified projects as possible options for Kim Cox but she was not assigned those projects.  (Def. Ex. 6, pp. 271-272)

  [23]  At his deposition, Austin claimed that he just "knew" that there was no work available in the fire department because he ran the department.  (Def. Ex. 6,  p. 32)

- 12 -

Austin had made one brief announcement that he had a firefighter looking for work (Def. Ex. 11, pp. 99-100); Town Manager Barry Feldman only recalled one occasion where Austin made such an announcement at a staff meeting (Pl. Ex. 3, 17, 29-30); and Laurie Murray stated that no one ever asked her for assistance to find work for the plaintiff. (Def. Ex. 15, p. 29) In fact, Murray admitted that she did not even start looking for an assignment for the plaintiff outside of the fire department until sometime in August. (Id.) [24]

On August 6, 1999, Murray did speak with Jim Capodiece, director of Leisure Services regarding a position for the plaintiff. (Def. Ex. 15, p. 50) At that time, Capodiece did not indicate that anyone else had spoken to him regarding a position for the plaintiff. (Id.) Murray had a second conversation with Capodiece on August 9, 1999, at which time, he indicated that someone had discussed the plaintiff in connection with a position in Leisure Services. (Id.) On August 9, 1999, the plaintiff also sent Austin an e-mail reiterating her request for a transfer. (Pl. Ex. 5) On August 9, 1999, the plaintiff also filed an administrative complaint with the Connecticut Commission on Human Rights and Opportunities and informed the defendant of this fact. (Def. Ex. 11, p. 134) On August 10, 1999, the defendant offered her a temporary position in the Leisure Services Department for the Town – a department separate and distinct from the Fire Department. (Def. Ex. 11, p. 124) The plaintiff worked in this temporary position from August 24 until the position was filled with a permanent hire in September of 1999. (Pl. Ex. 6; Def. Ex. 11, p. 135) During this time, she was paid a significantly lower salary than she had earned as a

---

[24] Murray stated that at that time, she relied upon Austin's representation that there was no work in the fire department for the plaintiff. (Def. Ex. 15, p. 125) Of course, her testimony obviously contradicts Austin's deposition testimony that as of mid-July, during his absence for his mother-in-law's funeral, the "people upstairs" were already looking for work for the plaintiff, since Laurie Murray was the "person upstairs." Thus, this is yet another genuine issue of disputed fact.

- 13 -

firefighter. (Def. Ex. 11, p. 144)[25] The plaintiff was also met with some hostility because her presence placed the Elmwood Community Center over budget. (Def. Ex. 11, pp. 126-127)

When the Leisure Service position ended, the defendant placed the plaintiff in another temporary position - this time working as a homework coordinator in the Human Services Department, but still outside of the Fire Department and at a lower salary. (Def. Ex. 11, p. 136)[26] The plaintiff remained in this position until the beginning of November. (Pl. Ex. 8) Hurley admitted that during this time, he spoke with the plaintiff's husband on one occasion and stated that he could really use the plaintiff in his office. (Def. Ex. 5, p. 110) It was not until the plaintiff was placed in the second position, and after the defendant had advertised for instructors for the refresher course, that Murray inquired as to the status of the bridge course. (Pl. Ex. 9)

     5.      The Failure To Be Assigned The Refresher Course

As discussed in section D, pp. 16-18, below Chief Austin admitted that the department always contained work which the plaintiff have performed on light duty.[27] The record reflects that not only was the plaintiff not assigned such work, in one case the Town literally hired someone from the street to perform it. This is the so-called refresher course.

The refresher course was necessary because the "bridge course," the teaching course

---

[25] Although the defendant claims that the plaintiff earned the "same rate of pay as anyone working in this position" there was no evidence presented as to the fact. According to Abery-Wetstone, Feldman stated that if the town paid Linda at her firefighter wage, it would be unfair to the other people in Human Services doing the same job and that other unions would get upset (Def. Ex. 17, pp. 110-111)

[26] Murray claimed that she did not know which budget paid Akerman's benefits during her alternative assignment, however, at the time that the plaintiff went to work for Human Services, her pay was coming out of the fire department budget. (Pl. Ex. 6; Def. Ex. 15, pp. 53, 65) Murray was not involved in setting the plaintiff's pay rate when she was working at Human Services. (Def. Ex. 15, p. 67)

[27] Austin also testified that the Fire Department and the union had a long-standing MOU on the treatment of a firefighter's benefits for the times when a firefighter was assigned to non-hazardous duty assignments and further that, such assignments existed in the department. (Def. Ex. 6, pp. 280-281, 291-293)

- 14 -

Austin discussed at the July 19, 1999 meeting, did not receive state approval until late fall. (Def. Ex. 5, p. 45) The refresher course, which was began in November was a Fire Department run EMT/MRT refresher courses necessary to keep certifications current in the meantime. (Id.) The plaintiff was not assigned to teach this course, even though it was similar to the bridge course Austin had discussed in July, and even though it was undisputed she was qualified to teach it.[28] Instead the Town hired non-Town employees, as a result of an advertisement which was posted in early October, 1999. (Pl. Ex. 10; Def. Ex. 5, p. 40) Thus, even as plaintiff was working outside of the Fire Department at a lower rate of pay at this time – and still waiting to be transferred back to the Department, the Town was actively advertising for instructors for a class being taught within the Fire Department. (Pl. Ex. 10) In fact other than one perfunctory email which was sent to the five station houses, at no time did the defendant inform the plaintiff that the instructor position was available or attempt to transfer her to that position. (Def. Ex. 13, pp. 361-362)

Nor did the Town even follow its usual procedures for hiring. Assistant Chief Charles Hurley, who was responsible for training in the fire department, did not go through employee services to advertise the position, nor did he take steps to inform any firefighters who were not on active duty about the position. (Def. Ex. 5, p. 40) In fact, instead of speaking with individual members of the fire department about the position, Hurley e-mailed the five station houses and advertised outside of the department. (Def. Ex. 5, pp. 40, 48, 53, 56; Pl. Ex. 11). Austin claimed

---

[28] When asked about the plaintiff's qualifications for teaching the bridge course, Hurley stated that while he was unsure of whether she had worked as a field paramedic, it would not have prohibited her from teaching, only who the Town partnered her with. (Def. Ex. 5, p. 93) At the time that the plaintiff was hired, she was a certified EMT and, while employed by the defendant, the plaintiff received her paramedic certification and is presently certified as an EMT P, which is the highest level of EMT certification. (Def. Ex. 11, pp. 8-9) Additionally, the plaintiff worked for a brief time for Hunter's Ambulance while employed by the Town. (Id., p. 18)

- 15 -

this was a "hint" notice to the plaintiff to respond to the position. (Def. Ex. 6, p. 148)[29]

The Town's Human Services department was no more helpful. Despite the fact that a teaching post had been discussed as an alternative assignment in July, Murray stated that no one had approached her about using the plaintiff to teach the refresher course. (Def. Ex. 15, p. 76) When confronted about this, Hurley blamed his lack of specific communication with the plaintiff regarding this position on hostilities with the firefighter's union.[30] (Def. Ex. 5, pp. 38-40)

---

[29] The plaintiff did not respond to Hurley's October 5, 1999 e-mail because she did not believe it was directed at her; "They knew I was looking and I was told I was doing this." (Def. Ex. 11, p. 182; Def. Ex. 13, p. 358) The plaintiff explained that it was her understanding that, through the e-mail, they were looking for people to work with her. (Def. Ex. 11, p. 182) More importantly, the plaintiff had been told that the defendant would be in touch with her once the class got going. (Def. Ex. 11, p. 190, Def. Ex. 13, p. 371) Additionally, in the defendant's Answer and Schedule A, provided to the Commission on Human Rights and Opportunities on September 22, 1999, the defendant attempted to defend against the plaintiff's claim by claiming that it had not denied her a transfer because she was going to be working on the MRT/EMT training course. (Pl. Ex. 12, ¶ 8; Pl. Ex. 13, p. 8)

The plaintiff was not the only person who believed that she would be assigned to a teaching position. Abery-Wetstone also testified that she believed that this position was to be the plaintiff's and that she would not have to apply for it. (Def. Ex. 17, pp. 108, 132) Additionally, Assistant Chief Allyn indicated that it was his assumption that the plaintiff would be doing some of the instructing with regard to the bridge course. (Def. Ex. 4, pp. 39-40, 46) Although the defendant tries to distinguish the fact that the course everyone thought the plaintiff would teach was the bridge course – which did not get approved until October – the fact is that the plaintiff was qualified to teach both positions, had been told she would be teaching and then the department did nothing to make this happen. The fact that the specific course available to teach in October was slightly different (and in fact, lower level) does not justify the defendant's inaction.

The defendant also attempts to suggest that the plaintiff would not have left the position in Human Services even for the refresher course. However, this is not an accurate characterization of her testimony. The plaintiff explained that she was very committed to her assignment and that she was unwilling to give it up only to find that there was no position in the Fire Department and she would be out of work again. "Certainly, my goal was to get back to on the job. That's what it was from July 19." (Def. Ex. 11, pp. 202-203)

[30] Hurley testified that there were two separate "MOUS" or "memorandums of understanding" with the union regarding the instructors; one for all training classes and one for the bridge course, however, both were entered into well after the refresher course was offered. (Def. Ex. 5, p. 39)

.....I don't deny that we had every intention of using Linda Akerman to teach classes. But you have to understand, whether it was the bridge course – which to me is almost a moot point because she was unavailable to teach the bridge course due to the nature of her injury in connection with her pregnancy. But with respect to the EMT/MRT refresher, she didn't respond in accordance with the MOU, so I had no – I had no other alternative but to not use her. And if I would have done that, even if I would have said, 'We're going to use Linda Akerman,' without a specific response from Linda Akerman the union would have beat me over the head with the labor department on that one.

(Id., p. 64)

- 16 -

However, Hurley did not approach the union leadership about the possibility of the plaintiff teaching the course as an alternative assignment. (Id., pp. 47-48) Indeed, the only person that Hurley did discuss the issue with was Austin. According to Hurley, Austin told him to adhere to the union's wishes and follow the MOU. (Def. Ex. 5, pp. 69-70)[31]

This explanation has its own factual problem – the MOU regarding training was not entered into by the Town and Union until November 30, 1999, nearly two months after the position was posted and filled. (Pl. Ex. 14; Def Ex. 6, pp. 258-259)[32]

D.    The Plaintiff's Return to the Fire Department

In the end of October, the plaintiff was suddenly and inexplicable moved back to the Fire Department. (Def. Ex. 11, p. 138) "Out of the blue, I was told by Susan, 'I'm sending you back to the fire department. You're done." (Id.)[33]    Allyn was told by Austin that the plaintiff was coming back to the Fire Department the next morning and instructed to find her something to do, and he found her a project in Fire Marshal Mike Sinsigalli's office. (Def. Ex. 9, p. 56) At this point, the plaintiff was approximately six months pregnant – at the same point in her pregnancy as Kim Peckham Cox, the firefighter who according to Austin had set a "precedent" in the department.

---

[31] Allyn also knew that Hurley was advertising the teaching position outside of the department and that it had been discussed for the plaintiff, but Allyn never discussed the position with her. (Def. Ex. 4, pp. 50-51)

[32] During her deposition, the plaintiff disputed Hurley's characterization of management-labor relations, explaining that there was no rule against fire officials talking to rank and file union members but rather, that the concern the union had was over "cutting deals" with individual members. (Def. Ex. 11, pp. 182-189) Additionally, at the time, no one ever told the plaintiff that the department could not speak directly with her regarding a placement. (Def. Ex. 11, p. 182) Despite this alleged prohibition and well after the position was posted, Hurley did speak with the plaintiff in general about coming back to the fire department to do some training but did not mention the refresher course. (Def. Ex. 11, p. 137) According to the plaintiff, this conversation occurred close in time to her transfer back to the fire department. (Def. Ex. 11, p. 138)

[33] The plaintiff explained that things were tense with her supervisor, Susan Halstead-Farr because she was missing time due to the promotional exam training she was attending. (Def. Ex. 11, p. 138)

- 17 -

(Def. Ex. 4, p. 56; Def. Ex. 11, p. 82)

At this time, there was no change in positions or availability of positions in the fire department. (Def. Ex. 11, pp. 138-139)   Once back at the Fire Department, the plaintiff began working on the "Life Safety Codes" project.[34] (Def. Ex. 11, p. 139) Sinsigalli explained that this project was something that he had wanted to do and a project discussed with other officers in the department and that he used the book to teach one of the certification courses. (Def. Ex. 9, pp. 25, 34-35)   During the time the plaintiff worked on the project, Allyn routinely asked the plaintiff about the project and appeared anxious for its completion. (Def. Ex. 11, p. 140)

According to Sinsigalli, the Life Safety Code project existed as early as July of 1999 and was not a "make work" project . (Def. Ex. 9, pp. 45-46)   Allyn admitted that this project could have existed in July. (Def. Ex. 4, pp. 57-58)   Austin also conceded that the plaintiff had suggested this project at the July 19, 1999 meeting, along with other suggestions for work during her transfer, and that he knew about the project. (Def. Ex. 6, pp. 248-249, 252) Austin did finally speak with Sinsigalli in November, who explained the project and that his response was "Okay,

---

[34]  Sinsigalli stated:

Linda worked on a project where the Connecticut Fire Safety Code is made up of a national consensus code written by the National Fire Protection Association called Life Safety Code. And because it's a national consensus code, Connecticut amends that, so they write their own little amendment to that code. So, for example, if there was a provision that said that – well, for example, one of the amendments in the NFPA Life Safety Code, an exit door has to be level on each side of the door. But in Connecticut we know we have snow and ice, especially this time of year, so Connecticut added an amendment that says you can have at the door an eight-inch drop down. So that was a Connecticut amendment. So in order to enforce the code, you would have to take a look at this section of the code that talked about the door drop-down, and then go to the Connecticut supplement to see if Connecticut modified it....And, what we were trying to do, and I had the Life Safety Code on disk, and I had the Connecticut supplement on disk, and actually, I had started working on the project in my spare time, is making the Life Safety Code from whatever file it was into a word document and then pasting the Connecticut stuff into it so that we would have one book to look at.  And you know, I would work on it a bit and then put it down because of everything else.....

(Def. Ex. 9, pp. 23-24)

- 18 -

that sound's great." (Def. Ex. 6, p. 247) After the plaintiff was injured, Sinsigalli finished the Life

Safety Codes book, although it took him until 2001. (Def. Ex. 9, pp. 34, 48-49) There is also one

book in each fire house. (Id., p. 35)

E.      The Town's Requirement That The Plaintiff Work After Her Injury

While working outside of the fire department, the plaintiff was also training for a

promotional exam to the position of driver. (Def. Ex. 11, pp. 147-148) After the cessation of the

exam, the plaintiff notified her commanding officer that she had injured herself while working on a

hydrant during the exam. (Id., pp. 170-171; Def. Ex. 13, p. 261)[35]  The injury the plaintiff suffered

became worse and the plaintiff sought worker's compensation for the injury. (Def. Ex. 11, pp.

179-180) While as discussed below, the Town had provided light duty assignments – without cut

in pay – for firefighters suffering non-work connected injuries, see Section F, pp. 19-20,

firefighters suffering work connected injuries were permitted to remain home and collect worker's

compensation pay until they fully recovered.   (Def. Ex. 6, pp. 184-185; Def. Ex. 11, pp.178-180)

Despite having been injured on the job and thus entitled to leave under worker's

compensation, the defendant required the plaintiff to continue to work in a limited capacity –

taking the position that the plaintiff could work in a light duty assignment in the Fire Department.

This directly contradicts their action when the plaintiff sought such positions because of her

pregnancy restrictions, and they claimed that there were no such light duty positions. (Def. Ex. 11,

pp. 177-179; Def. Ex. 6, p. 184; Def Ex. 5, p. 115; Def. Ex. 15, pp. 91-92) After the plaintiff's

---

[35] Despite defendant's attempt to characterize the plaintiff's behavior with regard to reporting the injury
as improper, the plaintiff reported her injury based upon her understanding that an employee was not supposed to
leave in the middle of an incident to report an injury. (Def. Ex. 11, p. 172) The plaintiff reported her injury
immediately after the test was over, first to Gary Allyn and then to risk management. (Id., pp. 172-173)

- 19 -

union intervened, the plaintiff left work and remained on worker's compensation until the birth of

her son. (Def. Ex. 11, p. 179)   As a result of this injury, the plaintiff ultimately accepted disability

retirement in September 2000.  (Pl Ex. 1)

     F.     <u>The Treatment Of Other Firefighters</u>

          1.     The treatment of similarly situated male firefighters

Despite the objections raised to the plaintiff's request and the claims that there was no such

thing as light duty work in the fire department, the defendant had provided male firefighters with

assignments off the line in the past without requiring them to exhaust all possible sick and vacation

time.[36]  Even Laurie Murray admitted that she had some concerns that the plaintiff was being

treated fairly than other firefighters, which she may have expressed those concerns with her boss,

Jim Francis. (Def. Ex. 15, pp. 107, 113) Murray indicated that her concerns were based on past

practice of the department.  (<u>Id.</u>, p. 123)

For example, firefighter Edward Farley was given an accommodation when he was unable

to work on the line, due to bad feet.  (Def. Ex. 4, p. 63; Def. Ex. 15, p. 109; Def. Ex. 6, pp. 314-

317)  Farley worked in this position in order to get his final year completed for pension purposes

(Def. Ex. 4, p. 64); he retired with 53 vacation days.  (Def. Ex. 15, p. 109)  Firefighter Brian

Tierney was also accommodated with a position in the office as a result of two broken legs that he

suffered. (Def. Ex. 4, p. 64; Def. Ex. 6, pp. 332-335; Def. Ex. 32)  In Tierney's case, he was given

a five month assignment in the office.  (Def. Ex. 32)  At the time of his detail, he had 20 sick days

---

[36] Austin identified firefighters Brian Tierney, Edward Farley and John Kupernick but stated that there were a few more accommodated whose names he couldn't remember.  (Def. Ex. 6, pp. 289-290)  Although Austin was not the Chief during Farley or Tierney's situations, Barry Feldman was the Town Manager and has been for the past eighteen years.  (Pl. Ex. 3, p. 10)

- 20 -

available, and at the time that this assignment ended, he had 55 vacation days and 26 1/4 sick days. (Def. Ex. 32, Pl. Ex. 16)[37]  At one point during his deposition, Austin attempted to distinguish the accommodations by stating that the male employees were required to exhaust all paid time, including sick time, prior to any transfers. (Def. Ex. 6, 288-289)  However, when confronted with the defendant's own documents, which demonstrated that both men had sick and vacation time available at the time of the transfer and/or when their employment ceased, Austin was unable to explain the basis for his belief.  (Def. Ex. 6, pp. 332-333, 347-349)

Additionally, another male firefighter, John Kupernick, was allowed to borrow against his sick time in order to cover for an illness shortly after joining the force.  (Def. Ex. 4, pp. 68-69; Def. Ex. 6, pp. 92-93)  Allyn claimed that Austin's position is that if a firefighter has accumulated sick or vacation time, that must be used before an accommodations are made.  (Def. Ex. 4, pp. 67-68)  However, Allyn and Austin also claimed that it was department policy that no one would go without a paycheck, but both admitted that this "policy" was not discussed during the meeting with the plaintiff.  (Def. Ex. 4, p. 69; Def. Ex. 6, pp. 93-95)[38]

      2.     The treatment of other pregnant firefighters

The defendant implies it couldn't have held animus towards pregnant firefighters because it

---

[37] Noticeably missing from the defendant's Ex. 32 is the December letter assigning Tierney to the office position, which indicates that at that time, he had 20 sick days available, directly contradicting Austin's claim that prior to any re-assignment being made, a firefighter had to use all of their sick time.  Thus it is one more example of the lengths the defendant will go to in order to divert this court's attention from the fact that there are genuine issues of disputed fact prohibiting summary judgment.  It is true that Tierney that, after he was scheduled to return to full duty, he was involved in another accident at home and requested to be permitted to use his vacation days in single increments in order to protect his leave time, and that request was denied. (Def. Ex. 32) However, it does not alter the fact that he was given a transfer prior to exhausting all leave time; that this transfer did not involve filling an "open and available position" and that this transfer was for a non-work related injury.

[38] Austin admitted that at the time he met with the plaintiff, he did not know how much sick leave she had available.  (Def. Ex. 6, p. 82)

- 21 -

treated previous pregnant firefighters so well.  During the plaintiff's tenure, there had been two

other firefighters who had pregnancies, Kim Peckham-Cox and Patricia Forester.  (Def. Ex. 11, p.

55, 73; Def. Ex. 13, p. 265-266)  Cox was the first firefighter to get pregnant and, during her first

pregnancy, she hid it until her sixth month, out of fear for her job.  (Def. Ex. 7, pp. 7-8)  When she

became pregnant for a second time, Austin was Chief.  (Id., pp. 16-19)  During her second

pregnancy, Cox dealt mostly with Union President Pat Brooks, who told her to produce a doctors'

note regarding her pregnancy.  (Id., p. 17)  Cox did so, in February.  (Id.)  According to Cox, her

doctor would not let her work on the line past her sixth month, which was May 1.  (Id., pp. 19-20)

Cox regularly discussed the status of her transfer with Brooks at least once each shift, and at one

point, Brooks told her that there was no work for her.  (Id., p. 21)[39]  Because Cox had a concern

about being out of work without pay and had been saving her sick time to use after the birth of her

baby, Cox continued to work on the line because she could not afford to be out of work without

pay for the duration of her pregnancy.  (Id., pp. 23-24)

    As late as April 14, the department had not found her work and she was getting close to

the date by which she had to be off the line - May 1.  (Id., p. 25)  Cox considered legal action and

explained, "I would say so because I was a little hurt and upset.  Because I know I'm a good

worker.  I was, like, "What is the deal?"  (Id,. pp. 26-27)  About one week from the May 1 date –

and at the sixth month of her pregnancy – Cox learned that she was finally being detailed to a

position in the Fire Marshal's office.  (Id., p. 28)[40]  When working in the office, Cox did not fill an

---

[39] Cox understood Brooks was communicating Austin's position that since there was no light duty, there
was no position for her.  (Def. Ex. 7, p. 22)

[40] Cox explained that she stayed on the line for a few days after Austin assigned her to the office position
because it was the end of her shift, and she had child care issues and doctors' appointments that had already been
planned around her shift schedule, whereas her office schedule was going to be Monday-Friday.  (Def. Ex. 7, p. 40)

- 22 -

open position that had been posted within the town, but was doing work that existed in the office. (Def. Ex. 7, p. 30; Def. Ex. 4, p. 18; Def. Ex. 5, pp. 123-124) [41] At that time, she maintained her same salary, accrued benefits and seniority.[42] (Def. Ex. 7, p. 29)

In its brief, the defendant argues that Cox believed that Austin treated her well and that she did not feel that he did not like her because she was a woman or pregnant. (Def. Brief p. 39)[43] However, Cox also explained that her transition to the office was "not smooth," and that during the time prior to actually working in the office, she felt anger and frustration with the process, even considering legal action. (Def. Ex. 7, pp. 48-50)

Firefighter Patricia Forester, who also became pregnant during Austin's tenure as Chief and requested a transfer, experienced similar difficulties and prejudice. (Pl. Ex.16)[44] Forester was told that she was not going to be transferred because there was no light duty and she could use sick or vacation time or talk to the Town about other positions. (Pl Ex. 16, ¶ 5; Def. Ex. 7, p. 14) Forester continued to work while looking for a transfer but got injured at a fire scene and remained out on worker's compensation and sick leave for the duration of her pregnancy. (Pl. Ex, 16, ¶ 9)

---

[41] Cox's work in the office consisted of inputting 3,000 occupancies, which she had to do twice, inputting the location of hydrants and comparing the EMT and MRT curriculum. (Def. Ex. 7, pp. 31-3) However, there was no testimony that the reason there was work for Cox was that the department had diligently been setting aside projects from February until May – instead, Allyn testified that he didn't even look for work for Kim because, according to him, at the time she asked to come off the line, the project was there. (Def. Ex. 4, p. 25)

[42] Cox explained that later, during the time she was teaching the bridge course, she had the option of staying in the office and continuing to accrue firefighter, benefits or going back on the line. (Def. Ex. 7, p. 34)

[43] The defendant suggests that simply because Austin was not outright rude to Cox during the time that she worked in the office, he could not have acted in a discriminatory manner towards her prior to her assignment to the office or towards the plaintiff. This simply has no basis in fact.

[44] Forester's second pregnancy occurred after the plaintiff had instituted the present litigation.

- 23 -

Cox actually witnessed Forester fall at the scene. (Def. Ex. 7 p. 15)

## II.    THE LEGAL STANDARD

Summary judgment may be granted only if the moving party is able to show that, "there is

no genuine issue as to any material fact," and that it is, "entitled to judgment as a matter of law."

Fed. R. Civ. Proc. 56(c)  A "material fact" is one whose resolution will affect the ultimate

determination of the case.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S. Ct. 2505

(1986)  A "genuine" issue as to such a material fact "only arises if the evidence would allow a

reasonable jury to return a verdict for the non-moving party."  Dister v. Continental Group, Inc.,

859 F.2d 1108, 1114 (2d Cir. 1988); Anderson, 477 U.S. at 248.

The moving party bears the initial burden of proving that no factual issues exist.  Gallo v.

Prudential Residential Services, 22 F.3d 1219, 1223 (2d Cir. 1994)  The non-moving party must

then make a "showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrell, 477

U.S. 317, 322-323, 106 S.Ct. 2548 (1986), cert. denied, 484 U.S. 1066, 108 S.Ct. 1028 (1988).

In assessing the record, the Court must resolve all ambiguities and draw all inferences in the light

most favorable to the non-moving party.  Gallo, 22 F.3d at 1223.  Because credibility is not an

issue on summary judgment, the non-movant's evidence must be accepted as true.  Gupta v. City

of Norwalk, 221 F.Supp.2d 282, 296 (2d Cir. 2002)

The trial court's task at summary judgment "is carefully limited to discerning whether there

are any issues of material fact to be tried, not to deciding them."  LaFond v. General Physics

Services Corp., 50 F.3d 165, 171 (2d Cir. 1995), citing Gallo, 22 F.3d at 1224.  "When reasonable

persons, applying the proper legal standards, could differ in their responses to the questions raised

- 24 -

on the basis of the evidence presented, the question is best left to the jury". <u>Hogan v. State of Connecticut</u>, 220 F.Supp.2d 111 (Conn. 2002), citing <u>Sologub v. City of New York</u>, 202 F.3d 175,178 (2d Cir. 2000) See also: <u>Gupta</u>, 221 F. Supp. 2d at 289.  Moreover, summary judgment must be sparingly used in discrimination cases, where intent and state of mind are at issue. <u>Graham v. Long Island. R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000).

> The trial court's function at this stage is to identify issues to be tried, not decide them. Summary judgment is sparingly used where intent and state of mind are at issue, see *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 103 (2d Cir. 1989), because, as we have emphasized, careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination, see *Belfi*, 191 F.3d at 135; *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994); *Gallo*, 22 F.3d at 1224.

<u>Id</u>.

In the instant case, there are numerous disputes issues of material fact which prohibit the granting of summary judgment.

**III.    ARGUMENT**

A.    <u>Summary of the Argument</u>

The complaint alleges three discrete types of mistreatment suffered by the plaintiff as a result of her becoming pregnant while employed by the defendant Town's Fire Department. First, the plaintiff alleges that the Town violated the affirmative provisions of C.G.S.§ 46a-60(a)(7)(E), which requires employers to seek to transfer a pregnant employee to a suitable temporary position if the employee's regular position poses a risk to her or her developing fetus. Second,  the plaintiff alleges that the Town discriminated against her on the basis of her sex, in violation of state and