- 25 -

federal anti-discrimination laws,[45] and on the basis of her pregnancy in violation of the federal

Pregnancy Discrimination Act, which requires that pregnancy be treated no differently than other

disabilities. Finally, the plaintiff alleges that the Town's treatment of her grew worse still, in

retaliation for her having complained about their unlawful conduct.

The defendant seeks summary judgment on the pregnancy transfer claim (46a-60(a)(7)(E))

despite the fact that a reasonable jury could find that when the plaintiff sought a transfer away from

active firefighting duties, there was suitable alternative work in the fire department, and the

defendant failed to make any good faith effort to find her suitable work, either in the department or

the Town at large. The defendant seeks summary judgment on the discrimination based claims

despite the fact that a reasonable jury could find that the plaintiff was treated less favorably than

similarly situated male employees with temporary disabilities, and that there is a direct and

circumstantial evidence of animus by the decision-maker towards pregnant employees, particularly

those like the plaintiff, seeking light-duty work before the sixth month of her pregnancy. And, the

defendant seeks summary judgment on the retaliation claim, despite the fact that a reasonable jury

could find that her treatment specifically worsened once she complained about the defendant's

misconduct, and that there is direct evidence the Fire Chief failed to seek alternative work for her

in whole or in part as a result of her invoking her statutory.

To justify their effort to seek summary judgment despite the clear existence of material

facts in dispute, the defendant ignores or distorts controlling law and precedent, ignores or distorts

the facts and ask the Court to draw every inference in its favor. For all of these reasons, summary

judgment must be denied.

---

[45] C.G.S.§46a-60(a)(1) and 42 U.S.C. § 2000e *et. seq.*

- 26 -

More specifically, the defendant first seeks summary judgment by concocting an exhaustion of remedies claim based on the existence of a union grievance procedure and/or Town personnel policies. This argument is so directly foreclosed by controlling precedent as to be frivolous on its face. While the defendant's effort to hide its clear substantive violation behind bogus procedural barriers is understandable, it need not detain the Court for long.

Next the Town addresses the pregnancy transfer claim. Since there are few cases interpreting this specific provision, the defendant makes much mischief by claiming that the plaintiff interprets the statute as forcing the Town to "create a job" for her due to her pregnancy. This is a distortion of the law, the facts and the plaintiff's claim. First, the evidence overwhelmingly shows that the defendant failed to make a good faith effort to find her a suitable transfer, which in and of itself is a violation of C.G.S.§ 46a-60(a)(7)(E)'s requirement that an employer "make a reasonable effort to transfer a pregnant employee to any suitable position..." This alone is enough to preclude summary judgment on this claim, even if the evidence were unclear about whether a suitable alternative job would have been found with a genuine good faith effort. Second, the evidence demonstrates that a suitable job would have been found had the employer made a reasonable effort. The Fire Department contained always-needed, ongoing work available to be preformed by non-firefighters or by firefighters temporarily unable to perform line fire duties due to a disability. Whether this is considered a temporary modification of a firefighter's duties during a disability or a temporary transfer to a new position in the department, the point is that the work existed and was available and the defendant violated 46a-60(a)(7)(E) by failing to transfer the plaintiff.

Next, the defendant turns to the discrimination based claims, seeking summary judgment by

- 27 -

distorting the facts and asking the Court to draw every inference in their favor. Specifically, the defendant claims that the plaintiff could not have been subjected to discriminatory treatment on the basis of sex or gender, because another pregnant woman eventually received a transfer. Here the defendant misses the point. The evidence demonstrates that the plaintiff, like other pregnant women, but unlike temporarily disabled men, was subjected to tremendous barriers to finding a suitable transfer, because she hadn't reached the sixth month of her pregnancy, and the key decision-makers believed that pregnant women were likely to be a "liability" willing to milk the Town by faking injuries during their pregnancies in order to stay home and receive their pay. Even without drawing every inference in the plaintiff's favor – as the Court is required to do – there is powerful evidence of discriminatory animus motivating the key decision-maker, there is powerful evidence that the animus did in fact infect the decision-making process towards the plaintiff, and there is powerful evidence that disabled men, not the targets of such animus, received superior treatment by the Town. Again, these disputed facts, discussed in more detail below, doom the defendant's efforts to get summary judgment.

Finally, the defendant argues that the plaintiff's retaliation claim must be dismissed because (in effect) they were already mistreating her before she complained, so how could their further mistreatment create any conflict. The facts show that as bad as the Chief's behavior was before the plaintiff complained, he threatened to, and in fact did treat her even worse once she invoked her state and federal statutory rights.

For all of these reasons, to be demonstrated more fully below, summary judgment must be denied and a jury must be given the opportunity to evaluate and remedy the numerous and varying ways in which the defendant's conduct violated state and federal law.

- 28 -

B.    The Plaintiff's Action Is Not Barred By The Collective Bargaining
      Agreement Or The Town's Personnel Rules

As stated above, the plaintiff has alleged discrimination in violation of state and federal law.

The defendant asserts that the plaintiff cannot bring these claims because she has failed to exhaust

her remedies under the grievance and arbitration procedure provided by her union's collective

bargaining agreement and under the Town's Personnel Rules.  (Def. Memo., pp. 22-27)  This

argument is foreclosed by controlling state and federal precedent and must be rejected.

The question of whether a collective bargaining agreement's grievance and arbitration

provisions waive an employee's right to litigate a federal statutory claim has been answered in this

jurisdiction.  In Wright v. Universal Maritime Service Corp., 525 U.S. 70, 79-80, 119 S. Ct. 391,

396 (1998), the Supreme Court declined to decide whether such a waiver could exist, but held that

it definitely would not exist unless the waiver was "clear and unmistakable."  The Second Circuit

has gone further, holding that an employee's statutory claim of discrimination cannot be waived by

the terms of a collective bargaining agreement.  Rogers v. New York University, 220 F.3d 73 (2d

Cir. 2000), cert den. 531 U.S. 1036 (2000); Fayer v. Town of Middlebury, 258 F.3d 117 (2d Cir.

2001); Ciambriello v. County of Nassau, 292 F.3d 307 (2d Cir. 2002).

In the instant case, the defendant positions its argument as one of exhaustion of remedies

rather than waiver, but the result is the same.  Judicial discussion of contractual waiver of statutory

employment claims has addressed both individual arbitration agreements and collective bargaining

agreements.  The defendant correctly points out that the two pivotal Supreme Court cases

addressing the issue had been Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S. Ct.

1647, (1991)(individual arbitration agreement constitutes valid waiver of statutory claim)  and

Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S. Ct. 1011 (1974)(collective bargaining

agreement does not waive statutory claims).   Both cases focused on whether arbitration provides

a sufficient forum to protect an employee's federally protected right to be free from discrimination

in employment.  Universal Maritime, supra, and the Second Circuit cases cited above address the

- 29 -

same question.  These more recent decisions plainly uphold <u>Gardner Denver</u> as to collective bargaining agreements.  Thus, an employee need not litigate her federal anti-discrimination claims through her union's collective bargaining process, and therefore logically is not required to exhaust her remedies prior to proceeding to court.

The question whether an employee covered by a union-negotiated collective bargaining agreement must exhaust her remedies before proceeding to court on a Connecticut constitutional or statutory claim is expressly answered in the negative by C.G.S.§31-51bb, which states in relevant part: "No employee shall be denied the right to pursue, in a court of competent jurisdiction, **a cause of action arising under the state or federal constitution or under a state statute solely because the employee is covered by a collective bargaining agreement.**" (Emphasis added)  Lest the statute itself leave any ambiguity, the Connecticut Supreme Court has stated that there is no such exhaustion requirement.  <u>Genovese v. Gallo Wine Merchants, Inc.</u>, 226 Conn. 475, 628 A.2d 946 (1993).  That holding has been reiterated in federal and state decisions, including <u>Local 1035 v. Pepsi-Cola</u>, 83 F. Supp.2d 301 (D. Conn. 1999); <u>Beason v. United Technologies Corp.</u>, 37 F.Supp.2d 127 (D. Conn. 1999); <u>Robinson v. SNET</u>, 33 Conn. App. 600, 637 A.2d 397 (1994); and <u>City of Hartford v. Hartford Municipal Employees Assoc.</u>, 259 Conn. 251 (2002).  The lead case cited by the defendant, <u>Hunt v. Prior</u>, 236 Conn. 421, 673 A.2d 514 (1996) is easily distinguishable – it involved common law claims, as opposed to constitutional or statutory claims.  Thus, it is beyond dispute that the plaintiff's claims under Connecticut law do not require that she exhaust her remedies under her union's collective bargaining agreement.

The claim that the plaintiff must exhaust Town personnel rules is equally baseless.  The Supreme Court has made it clear that, even in discrimination cases where the question of employer liability turns on notice and the employer can raise its lack of notice through an affirmative defense based upon the plaintiff's failure to follow an internal complaint procedure, the only time that such a defense is available is if the plaintiff has not suffered an adverse employment action, such as a

- 30 -

loss of pay or position.  See, <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 808, 118 S. Ct. 2275, 2293 (1998), <u>Burlington Industries v. Ellerth</u>, 524 U.S. 742, 760-763,118 S. Ct. 2257, 2268-9 (1998); <u>Meritor v. Vinson</u>, 477 U.S. 57, 72-3, 106 S. Ct. 2399, 2408 (1986).  In this case, the plaintiff has suffered an adverse employment action.  Second, a plaintiff has even fewer individual rights under the Town's personnel rules than she does under a collective bargaining agreement, so it makes even less sense to impose an exhaustion requirement for personnel rules.  Thus, it is not surprising that the defendant cites no case law in support of its proposition that an employee must exhaust municipal personnel policies before bringing a federal or state statutory claim, despite the fact that there are literally hundreds of reported discrimination cases brought against town and cities by municipal employees.  Finally, both federal and state anti-discrimination statutes specifically reference administrative procedures before the Equal Employment Opportunity Commission (EEOC) and Connecticut Commission on Human Rights and Opportunities (CHRO) that must be exhausted before proceeding to court.  See,  42 U.S.C. § 2000e-5[46]; C.G.S.§ 46a-100.  Thus, the defendant's personnel rules argument is inconsistent with Supreme Court precedent, totally without any judicial support, fundamentally illogical, and unsupported by the statutory language.

The  plaintiff was not required to exhaust administrative remedies under either her union's collective bargaining agreement or municipal personnel procedures before bringing this action.  The defendants' motion for summary judgment as to this ground must be denied.

---

[46]  While it 42 U.S.C. § 200e-5 does make mention of "State or local enforcement agencies", it is clear from the language of the statute that it did not contemplate vaguely worded personnel rules or Personnel Boards with limited power as being a "local enforcement agency."

- 31 -

C.   The Town's Treatment of the Plaintiff's Request For A Transfer Violated The Affirmative Obligation Placed On Employers By C.G.S.§ 46a-60(a)(7)

1.   The Appropriate Legal Analysis for Claims Brought Pursuant To C.G.S.§ 46a-60(a)(7)(E) Makes an Employer's Failure or Refusal to Make Reasonable Efforts to Find a Suitable Transfer in and of Itself a Violation of the Act.

C.G.S. § 46a-60(a)(7)(E) on its face places affirmative duties upon employers.  It makes it a "discriminatory practice" for any employer:

to fail or refuse to make a reasonable effort to transfer a pregnant employee to any suitable temporary position which may be available in any case in which an employee gives written notice of her pregnancy to her employer and the employer or pregnant employee reasonably believes that continued employment in the position held by the pregnant employee may cause injury to the employee or fetus.

The use of the disjunctive "or" shows that there are two ways the employer violates the statute: it can "fail" to transfer the employee "to any suitable temporary position", or it can "refuse to make a reasonable effort."  As the court stated in <u>Fenn Manufacturing v. Commission on Human Rights and Opportunities,</u>

[B]ecause an employer's failure or refusal to make such a reasonable effort to find its pregnant employee a suitable temporary position will make it difficult at best for an employee to prove that such a position was in fact available for her, <u>an employer which fails to make such an effort must be held to have violated its statutory duty to the employee no less than an employer which fails or refuses to place its employee in a suitable temporary position which clearly existed</u>.

1994 WL 51143 (Feb. 8, 1994, Sheldon, J.), aff'd by 232 Conn. 117, 652 A.2d 1011 (1995). While <u>Fenn</u> is the only reported case on this statute, its teaching, and the language of the statute itself are clear – the employer commits a discriminatory practice simply failing or refusing to make a reasonable effort to find a suitable job, regardless of whether such a job is later proven to have existed.[47]

---

[47] 46a-60(a)(7)(E) is thus very different from Title VII, which is violated only when employers create produce different terms and conditions of employment between protected and unprotected classes, and where bad faith alone is not sufficient to create a violation.  Instead, "when a plaintiff in a Title VII case proves that her

- 32 -

2.      "Reasonable Effort" Pursuant to C.G.S. §46a-60(a)(7) Means a Good-faith,
        Thorough, and Conscientious Effort to Find a Suitable Transfer

The next question is the definition of "reasonable efforts" as it is used in C.G.S. §46a-

60(a)(7)(E).  In this too, the Court should be guided by <u>Fenn</u>:

> First, the employer must closely examine the employee's existing position to
> determine whether or not there is sufficient flexibility in it to permit her to perform
> her assigned tasks in a modified manner without either compromising her job
> performance or exposing herself and her fetus to the workplace danger she
> reasonably seeks to avoid.  If such modified version of her existing position can be
> so identified, the employer must <u>immediately</u> make it possible for her to be placed in
> that position until the danger she fears has been eliminated or her pregnancy is at an
> end.

<u>Id</u>. at * 22.  According to <u>Fenn</u>, if it was not possible to modify the employee's existing position:

> [ ] the employer must next attempt to determine if a different suitable temporary
> position is currently available for her in its workforce.  To that end, it must first
> examine its entire workforce to determine what positions are or may soon become
> available for the pregnant employee.  Then it must decide if any such position might
> be suitable for her by comparing the employee's known qualifications and
> credentials and the terms and conditions of her existing position with the minimum
> qualifications for and terms and conditions of any available position to which she
> might appropriately be transferred.  Only by <u>conscientiously making such a
> thorough, good faith effort to find an appropriate match between the pregnant
> employee and any position which is or may become available for her can the
> employer, which is uniquely well positioned to know its own workforce and to
> assess its own business needs, make a meaningful determination whether a suitable
> temporary position is actually available for the pregnant employee in the relevant
> time frame.</u>

<u>Id</u>.

---

gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by
proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the
plaintiff's gender into account."  <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 109 S.Ct. 1775 (1989).  Of course
the employer in the instant case cannot come close to meeting its burden, even if <u>Price Waterhouse</u> were the
standard subsection 7(E), rather than <u>Fenn</u>.  See Section 3, below.

- 33 -

3.    The Defendant Failed to Make A Reasonable Effort To Transfer
      the Plaintiff

There are an overwhelming array of material facts from which a reasonable jury could

conclude the defendant failed to make a good-faith, thorough and conscientious effort to find her a

suitable temporary transfer.  That evidence begins just two weeks after the transfer request, on July

19, 1999, the day that the plaintiff was originally set to begin working in the alternative

assignment.  Austin informed the plaintiff that there was no work and her only options were sick

leave, leave without pay or vacation time.  (Def. Ex. 11, pp. 58, 69) While Austin justified his

conduct by claiming that it was his department and he knew what work was available, he was

unable to identify the specific steps that he took to reach the conclusion that there was no work

within the fire department for the plaintiff. (Def Ex. 6, pp. 30-31, 33-34, 40, Def Ex. 11, pp. 99-

100; Def. Ex. 15, p. 21; Pl. Ex.3, pp. 17, 29-30)  Austin did not even talk to three of the four

Assistant Chiefs about work for the plaintiff during July and August.  (Def. Ex. pp. 33-34, 40)

Austin's desultory "efforts" only continued and got worse.  At no time did Austin speak

with Assistant Chief Hurley or Assistant Chief Eric Munsell as to whether there was any work in

his office for the plaintiff and he only spoke to Fire Marshal Sinsigalli in the late fall, within a week

or two of the plaintiff's return to the department.  (Def. Ex. pp. 46; Def. Ex. 6, pp. 33, 42; Def.

Ex. 9, p. 47) The Town Manager can only recall one occasion where the issue was discussed at a

Town-wide meeting. (Pl. Ex. 3, p. 17, 29-30).  Laurie Murray, the Human Resource Specialist

assigned to the fire department stated that she was not even contacted by Austin in his "efforts" to

find an alternative placement - directly contradicting Austin's testimony that the "people upstairs

were looking for work." (Def. Ex. 15, p. 29)  Additionally, Susan Halstead-Farr, Director of the

- 34 -

Human Services, Department to whom the plaintiff was eventually assigned, told the plaintiff that

she only recalled one time when Austin mentioned something about a firefighter looking for work.

(Def. Ex. 11, pp. 99-100)  And, there is Austin's claim, that while he was "begging and pleading"

to find work for the plaintiff, he didn't offer her a position teaching the refresher course that began

in October – a position that it filled by hiring <u>outside</u> of the department – because she didn't return

an e-mail, a claim which appears to have been created in order to explain away the fact that the

defendant never intended to accommodate the plaintiff.  (See above, pp. 14-16)[48]

There is also direct evidence that Austin's bias towards pregnant women infected his

decision-making, making it impossible for him to engage in the good-faith efforts required by the

statute.[49]  For example, Austin told both the plaintiff and former Councilwoman Holly Abery-

Wetstone in separate conversations that he considered the plaintiff a liability due to her pregnancy.

---

[48] The defendant suggests that the reason that she did not get this position is that the plaintiff failed to apply for it after she got an email,  and no one in the department could discuss the position with the plaintiff, because the union prohibited it. (Def. Brief, pp. 15-16)  In support of this argument, Chief Hurley explained in great deal the problems that existed between the union and the management as a result of management talking to members about teaching positions; that all contact was managed through "Memorandums of Understanding"; and that once such MOU barred him from speaking with the plaintiff about the instant position. (Def. Ex. 5, pp. 38-40; 64)

However, the MOUS referenced by both Austin and Hurley were not in existence in October of 1999; (Pl. Ex. 14) and Hurley admitted that he took no steps to address the issue with union leadership but did discuss the issue with Austin, who told him to abide by the union wishes. (Def. Ex. 5, pp. 47-8)  Additionally, at least three individuals – Assistant Chief Allyn, former Councilwoman Abery-Wetstone, and the plaintiff – believed that the teaching position was the plaintiff's and neither Abery-Wetstone nor the plaintiff were ever told she would need to re-apply for an accommodation when the teaching position was approved. (Def. Ex. 11, p. 182; Def. Ex. 13, p. 358; Def. Ex. 17, pp. 108, 132; Def. Ex. 4, pp. 39-40, 46).

Moreover, at the time, the plaintiff had an active lawsuit against the Town seeking exactly such a position, and , the Town, in its CHRO answer, claimed that the position was the plaintiff's. (Def. Ex. 29; Pl. Ex. 12; Pl. Ex. 13)  However, after being confronted with its failure to offer the refresher position to the plaintiff,  the defendant shifted its focus to blaming the union.

[49] The defendant attempts to dismiss claims of Austin's animus, by relying upon Kim Cox's statement that Austin treated her well while she was working in the office, citing the fact that the Chief took the office staff out to lunch prior to her leaving for maternity leave. (Def. Brief, p. 39) However, Cox also testified about the difficulties she had with Austin prior to getting into the office. (Def. Ex. 7, pp. 48-51) Furthermore, there is no requirement that an employer, who is acting with discriminatory animus do so in a mean or nasty manner.

- 35 -

(Def. Ex. 11, p. 102; Def. Ex. 17, pp.72, 95)  Additionally, during Austin's deposition, when asked

why the status of the plaintiff's previous work related back injury was important to him, Austin

stated **"we had already had one female who had been off the entire time claiming a previous**

**injury, so it was significant to me to ask her that question because I didn't know if that was**

**something she was planning on doing or what..."** (Def. Ex. 6, pp. 76-77)[50]   Abery-Wetstone

also confirmed that she was given the impression by Austin, as well as Town Manger Barry

Feldman, that Forester (the pregnant firefighter) had faked her injury in order to get her full pay

during her pregnancy and further that the plaintiff would do the same thing.  (Def. Ex. 17, pp. 134-

135)  Kim Cox also testified that she had heard management suggest that Forester's injury was not

legitimate.  (Def. Ex. 7, p. 16)

 Furthermore, despite the defendant's denial that timing played a role in Austin's animus,

there is evidence that he told the plaintiff that she was not "that pregnant," that "she didn't look

pregnant," that "she could work but <u>chose</u> not to," and that Cox had set a precedent by staying on

the line until her sixth month of pregnancy.  (Def. Ex. 11, p. 82; 84-85)  These comments support

the claim that Austin's unwillingness to comply with the law was based in part on the stage of the

firefighter's pregnancy.[51]

---

[50] This was not an isolated comment as  Austin went on to state:
"we had a situation involving another female who says she was pregnant and then immediately said I'm hurt and
went off and we never heard from her again for about a year, and she was off that whole time.  And it was never a
pregnancy, it was a worker's comp. injury.  Okay?  So all I'm saying is the following year, or whatever time it was
when this question came up involving Linda, you know, my not necessarily fear by my concern was, was she going
to try to connect the pregnancy to some previous injury or something; and she said no, I'm 100 percent."
(Def. Ex. 6, pp. 76-77)

[51] The defendant mis-characterizes the plaintiff's argument by suggesting that the plaintiff's claim is
based upon the proposition that Cox's more favorable treatment was due to the fact that Cox chose to reveal her
pregnancy at the sixth month.  This is not the plaintiff's argument, nor is it based in fact since Cox disclosed her
second pregnancy – the pregnancy during Austin's tenure – well in advance of the six month deadline for removal
from the line.  The plaintiff's claim is quite simple and supported by the evidence; the defendant had hostility

- 36 -

Austin's treatment of the other two pregnant firefighters offers further support for this claim. Indeed, Kim Cox testified that she had some concerns over the delay in removing her from the line, that she would have left before her sixth month had she had the opportunity but that she was fearful of being forced to stay home, on unpaid leave because she could not afford to do so and that she even considered taking legal action against the Town because she did not receive a transfer until her doctor ordered her off the line in her sixth month.  (Def. Ex. 7, pp. 23-24, 49)

This scenario is supported by the experiences of yet another pregnant firefighter, Patricia Forester.  Forester, during the third month of her first pregnancy, requested an assignment off the line but was told that there was no assignment because there was no light duty, and that her options were sick leave, vacation or leave without pay.  (Pl. Ex. 16, ¶ 5) She was injured while waiting for a transfer and spent the rest of her pregnancy on workers' comp. (Pl. Ex. 16, ¶ 9)

From this evidence, combined with the fact that when the plaintiff was returned to the Fire Department in November – at the sixth month of her pregnancy – she was assigned a project which Austin admitted that he was aware existed in July and was proposed by the plaintiff in July– (Def. Ex 6, pp. 248-249, 252), a reasonable jury could certainly find that the defendant failed or refused to make reasonable efforts to transfer the plaintiff.

4.      Even If the Statute Required Evidence That a Suitable Temporary Position Existed, Summary Judgment must Fail, Because a Reasonable Jury Could Find That Such a Suitable Position Was Indeed Available for the Plaintiff

The defendant spends a great deal of time arguing that regardless of what efforts it made, the bottom line is that there was no "open available posted position" and no requirement that the

---

towards pregnant fire fighters that prohibited the plaintiff (and the other two pregnant female firefighters) from being transferred to less hazardous positions within the department until she (and they) reached an acceptable and visible level of pregnancy –which Austin himself appears to have set at the sixth month.

- 37 -

defendant create a position simply because the plaintiff requested it. As demonstrated above, the defendant's failure to make good faith efforts is itself enough to constitute a violation of the statute. However, even if it was necessary for the plaintiff to show that a suitable job existed, summary judgment would be inappropriate, but the record reflects a whole series of disputed facts from which a reasonable jury could conclude that such a position existed.[52]

The defendant attempts to mislead this Court by suggesting that it only transferred employees when there was an "open available posted position," a claim that the evidence clearly contradicts. Indeed, the defendant could have granted the plaintiff's transfer without there being an "open available posted position" because work existed within the department that was not assigned to an open available position and, in the past, the Town had provided firefighters with work without such an available position. Although no posted position existed at the time of the plaintiff's request, the facts demonstrate that, in essence there are always a permanent opening for firefighters to perform non-firefighting duties when firefighters are available to do so. For example, there is often work in the office, working on training materials or other administrative duties.[53] Even Austin conceded that there is <u>always</u> work available in the department. (Def. Ex. 6, p. 34)[54] Indeed, both Abery-Wetstone and the plaintiff identified work that the plaintiff was

---

[52]  If the Court were to deem it necessary to determine if a suitable job existed, the defendant should bear the burden of production and persuasion on this issue, as it would under Title VII once bad faith were established. See note 47, above.

[53]  Even the defendant conceded that there was always a need for firefighter assistance with fire inspections, however, this was not a function that the plaintiff could perform at the time of her request due to the additional training requirements – training requirements which are routine for everyone above the rank and file firefighter. Moreover, there was no prohibition on a rank and file member from being certified. (Def. Ex. 9, pp. 15-16)

[54] Additionally, the very fact that the Town wanted a light duty provision for firefighters also indicates that it could contemplate some work an injured firefighter could perform that was not on the line.

- 38 -

capable of performing within the fire department. (Def. Ex. 11, pp. 54-55, 59; Def. Ex. 17, pp. 87, 119)  In the past, male firefighters were given this work.  Additionally, when a pregnant firefighter reached a point of being noticeably pregnant and the Chief deemed it appropriate to remove her from the line – she received this work.

In attempting to distinguish these past assignments, the defendant claims there was no available work because there were no projects of "imminence" to the department and argues that the work that the plaintiff identified as being available was not imminent.  However, this is not the standard, nor does it appear to be the standard applied by the Town when providing alternative assignments in the past.  Indeed, there was work available within the department; this was confirmed by the fact that the plaintiff was eventually re-assigned there in November, to a project that existed in July.

Nor is it relevant whether these projects are deemed suitable alternative jobs, or merely modifications of the plaintiff's position.   As the Court in Fenn stated, an employer must closely look at the pregnant employee's position – which is clearly available to her – and determine if there modifications are possible; if so, the transfer to less hazardous duties must be immediate.  Fenn, supra at 22.

In short, even if the Court were determine it necessary to establish the existence of a suitable temporary assignment, the record reflects abundant evidence from which a reasonable jury could so find.   For the foregoing reasons, summary judgment on this claim must be denied.[55]

---

[55] The defendant compounded its violation of the statute, when it managed to underpay the plaintiff when she was finally transferred to a temporary position (after using approximately five weeks of sick time and filing a discrimination charge with the CHRO).  The defendant has offered a variety of reasons as to why the plaintiff was paid far less in her alternative assignment, but all must fail.

First, the defendant argued that she should only be paid what the position paid.  Then, the defendant argued that, if she received her firefighter salary, the defendant would be in trouble with the other unions in the

- 39 -

D.   **The Plaintiff's Discrimination Claims Survive Summary Judgment Because There Is Direct And Circumstantial Evidence Of Discriminatory Animus By The Decision-Makers Toward Pregnant Employees**

The plaintiff further alleges that the defendant's treatment of her violated Title VII, 42 U.S.C. § 2000e-2 and C.G.S.§ 46a-60(a)(1)– in other words, constituted "classic" discrimination on the basis of her sex and her pregnancy.[56]   In support of this claim, the plaintiff relies upon evidence that the defendant has a history of accommodating similarly situated male firefighters.[57] Additionally, the plaintiff cites substantial evidence of discriminatory animus towards pregnant women and women in general, on the part of both Austin, the Fire Chief and Barry Feldman, the Town Manager. Thus, these claims too survive summary judgment.

---

Town because it would create unfairness.  Then, the defendant argued that it would disrupt the budgets of the other Town agencies where she worked.  Lastly, the defendant argued that it would create a hardship on the taxpayers of the Town because they would be paying a firefighter salary in addition to any overtime necessary to cover her shift.

However, these arguments are not persuasive.  First, one of the positions that the plaintiff was placed in a position which was previously volunteer, so there was no real pay scale.  Second, the defendant provided no evidence that any unions had raised any concerns over pay equity in such a scenario.  However, the last two arguments – that it was somehow disruptive to the other budgets and tax papers are the most deceptive because, at least for part of the time she worked on the alternative assignment, she was paid out of the fire department budget.  Therefore, the fire department got an actual benefit, because it was able to pay a firefighter at less than her firefighter rate of pay for at least 1 month.  Under this scenario, the fire department would have no incentive to ever accommodate pregnant firefighters within the department, because, as a firefighter became pregnant and requested a transfer, the department could ship her off to a different department and pay her at a dramatically lower rate of pay.  Finally, this situation is not unlike a claim for reasonable accommodation under the Americans with Disabilities Act.  In that situation, although an employer is not required to give an employee a promotion as a "reasonable accommodation" an employer is required to first consider positions that are "lateral moves" and can only consider "lesser jobs that constitute a demotion and are at a lower pay grade,  if there are no such equivalent positions available.  Dilley v. Supevalu, Inc., 296 F.3d 958, 964 (10th Cir. 2002).

[56]  42 U.S.C. §2000e-2, which prohibits employment discrimination on the basis of sex is modified the Pregnancy Discrimination Act of 1978, codified in 42 U.S.C. § 2000e(k) and  includes claims based upon pregnancy.

[57] The defendant argues that because a pregnant firefighter received a transfer to a non-hazardous position at the sixth month of her pregnancy, it proves that it did not discriminate in the plaintiff's case on the basis of pregnancy.  This is simply inaccurate.  Non-discrimination requires that plaintiff's pregnancy be treated like other disabilities, not that she be required to wait 6 months because she was "not that pregnant."

- 40 -

1.    Legal Standard for Proving Discrimination

In order to succeed on a claim of sex and pregnancy discrimination under Title VII, the

plaintiff must demonstrate that: (1) she is a member of a protected class - a pregnant employee;

(2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) the

circumstances give rise to an inference of discrimination. Weinstock v. Columbia University, 224

F. 3d 33 ($^{2d}$ Cir. 2000), cert denied, 124 S.Ct. 53 (2003) . The plaintiff's burden at this stage is not

a heavy one. Soares v. University of New Haven, 154 F.Supp.2d 365, 373 (D. Conn. 2001)

Courts reviewing claims brought pursuant to C.G.S.§ 46a-60(a)(1) apply the same standards as

those applied to claim brought under Title VII. See, Levy v. Commission on Human Rights and

Opportunities, 236 Conn. 96, 103, 671 A. 2d 349, 355 (1996).

If the plaintiff makes out a *prima facie* case, a presumption arises that the employer

unlawfully discriminated, and the burden shifts to the Defendant to proffer a nondiscriminatory

reason for the adverse employment action.  If the employer introduces such evidence, the  burden

returns to the plaintiff to prove "that the legitimate reasons offered by the Defendant were not its

true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Products Co.,

530 U.S. 133, 143 120 S.Ct. 2097 (2000)  The ultimate question is whether a reasonable person

could find that the adverse employment action complained of was motivated at least in part by

prohibited discrimination. Stratton v. Dept. for the Aging, 132 F.3d 869, 878 (2d Cir. 1997)

The plaintiff is not required to prove that the prohibited motivation was the sole or even

the principal factor in the decision, or that the employer's proffered reasons played no role in the

employment decision, but only that those were not the only reasons and that the plaintiff's

protected status contributed to the employer's decision. Holtz v. Rockefeller & Co., 258 F.3d 62,

- 41 -

78-79 (2d Cir. 2001); <u>Renz v. Grey Advertising, Inc.</u>, 135 F.3d 217, 220-222 (2d Cir. 1997);

<u>Stratton</u>, 132 F.3d at 878; <u>Cronin v. Aetna Life Insurance Co.</u>, 46 F.3d 196, 203 (2d Cir. 1995).

Because direct evidence of discrimination is seldom available with respect to an employer's

mental processes, plaintiffs in discrimination suits must rely on the cumulative weight of

circumstantial evidence. <u>Carlton v. Mystic Transport, Inc.</u>, 202 F.3d 129, 135 (2d Cir. 2000), <u>cert.</u>

<u>denied</u>, 530 U.S. 1261, 120 S.Ct. 2718 (2000); <u>Banks v. Travelers</u>, 180 F.3d 358, 367 (2d Cir.

1999); <u>Danzer v. Norden Systems, Inc.</u>, 151 F.3d 50, 56-57 (2d Cir. 1998); <u>Norton v. Sam's Club</u>,

145 F.3d 114, 119 (2d Cir. 1998), <u>cert. denied</u>, 525 U.S. 1001, 119 S.Ct. 511 (1998)[58]   To meet

this burden, the plaintiff may rely "on the evidence constituting the *prima facie* case, together with

supportable inferences to be drawn from the false or erroneous character of the employer's

proffered reason for the adverse action." <u>Carlton</u>, 202 F.3d at 135.  <u>See also</u>, <u>Reeves</u>, 530 U.S.

133, 120 S.Ct. 2097 (2000); <u>Aka v. Washington Hosp. Ctr.</u>, 156 F. 3d 1284, 1292-1293 (D.C. Cir.

1998).

Again the summary judgment dictates of <u>Gallo</u> must be remembered:

> The trial court's function at this stage is to identify issues to be tried, not
> decide them. Summary judgment is sparingly used where intent and state of mind
> are at issue, see *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 103 (2d
> Cir. 1989), because, as we have emphasized, careful scrutiny of the factual
> allegations may reveal circumstantial evidence to support the required inference of
> discrimination, see *Belfi*, 191 F.3d at 135; *Chertkova v. Connecticut Gen. Life Ins.
> Co.*, 92 F.3d 81, 87 (2d Cir. 1996); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d
> 29, 37 (2d Cir. 1994); *Gallo,* 22 F.3d at 1224.

---

[58]The thrust of the Supreme Court's reasoning in developing the three-part analysis set out in <u>McDonnell</u>
<u>Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817 (1973) and <u>Texas Department of Community Affairs v.</u>
<u>Burdine</u>, 450 U.S. 248, 101 S.Ct. 1089 (1981), was to create a mechanism to allow victims of discrimination to
establish their cases through inferential and circumstantial proof.  <u>See Trans World Airlines v. Thurston</u>, 469 U.S.
111, 121, 105 S. Ct. 613 (1985) ("[t]he shifting burdens of proof set forth in <u>McDonnell/Douglas</u> are designed to
assure that the Plaintiff [has] his day in court despite the unavailability of direct evidence.")

- 42 -

Gallo, supra at 38.

2. There is an Abundance of Evidence From Which A Reasonable Jury Could Conclude the Plaintiff was a Victim of Discrimination

In the instant case, the plaintiff successfully establishes a prima facie case of pregnancy discrimination: (1) she is a member of protected classes - female and pregnant; (2) she was qualified to perform her position; (3) she suffered an adverse employment action when she was denied a transfer; and (4) similarly situated male employees were not subjected to similar treatment. Additionally, the plaintiff has provided sufficient evidence of discrimination to demonstrate the defendant's proffered reasons are false.[59] Thus, these claims also survive a motion for summary judgment.

There is evidence that on at least two occasions, male firefighters were provided with alternative assignments off of active duty for non-work related temporary disabilities. Both Brian Tierney and Edward Farley, were permitted to work in the office for extended periods of time rather than go without a pay check. (Def. Ex. 6, pp. 289-290, 314-316, 332-335; Def. Ex. 4, pp. 63-64, 68-69) At one point during his deposition, Austin attempted to distinguish the accommodations by stating that the male employees were required to exhaust all paid time, including sick time, prior to any transfers. (Def. Ex. 6, 288-289) However, when confronted with the defendant's own documents, which demonstrated that both men had sick and vacation time available at the time of the transfer and/or when their employment ceased, Austin was unable to

---

[59] The defendant further attempts to distract from the real issue in this case, by suggesting that the defendant could not discriminate against pregnant women because it selected Kim Cox, to teach the bridge course. However, this has no bearing on whether the department was opposed to meeting its legal obligations to pregnant firefighters who wanted to continue to work in the department during their pregnancies. The plaintiff has not alleged that the defendant discriminates against all female firefighters because they have had children.

- 43 -

explain the basis for his belief. (Def. Ex. 6, pp. 332-333, 347-349)  Additionally, Laurie Murray,

was aware of the male employees' accommodations and conceded that it is possible the men were

not required to exhaust all time before the accommodations were made. (Def. Ex. 15, p. 107)

Additionally, a third male firefighter, John Kupernick, who served under Austin was

permitted to borrow against his future sick time, after exhausting his bank, in order to continue to

receive a paycheck during his illness.  Austin defended his decision with regard to Kupernick by

stating that no firefighter would go without a paycheck.[60]  (Def. Ex. 6, pp. 93-95)  However, both

he and  Allyn admitted that the plaintiff was not offered a similar option, even though she explicitly

raised concern during the July 19, 1999 meeting about the fact that, being required to use sick time

for such an extending period would require her to exhaust her entire bank of sick time and she

inquired about borrowing against her spouses' sick time. (Def. Ex. 4, p. 69; Def. Ex. 6, pp. 93-95)

The defendant attempts to distract from the difference in Akerman and Kupernick's treatment by

minimizing the plaintiff's fears about exhausting her sick time, claiming that she had allegedly

"months" of sick time.  However, Austin admitted that, at the time he was discussing the plaintiff's

options with her, he had no idea how much time sick time had available to her.[61]  (Def. Ex. 6, p.

82)

Furthermore, as described in full detail above, at pages 34-36, there is ample direct

evidence of the Town's discriminatory animus towards pregnant women.  During a meeting with

[60]  While it may be admirable that defendant wanted to help a newly hired firefighter, it is equally reprehensible that this concern seemed only to apply to male employees; pregnant firefighters were on their own.

[61]  Calculations suggest that she had accumulated a few months worth of time.  However, at the time she was being ordered to use it – July -- she was in the second month of a nine month pregnancy – she delivered at the end of February.  Therefore, even a "couple" of months worth of sick time was not going to take her that far into her pregnancy and had she been required to continue on sick leave, she would very quickly have found herself out of work without a paycheck.

- 44 -

former Councilwoman, now Connecticut Superior Court judge, Holly Abery-Wetstone, Town

Manager Feldman dismissed the need for a maternity policy for pregnant public safety employees

by claiming that all women would want to be pregnant so that they could telecommute.

Additionally, both Feldman and Austin made comments comparing the plaintiff's request for a

transfer to another pregnant firefighter who they believed faked an injury in order to collect

worker's compensation during her pregnancy – a firefighter who had been told that there would

not be a non-hazardous position for her during her pregnancy. Additionally, Austin specifically

referred to the plaintiff as a liability, told her that she "was not that pregnant;" "didn't look that

pregnant," "that she could work and chose not to" and that Cox had set a precedent by working

until her sixth month. Further, when he informed her that she would be forced to use sick,

vacation or leave without pay, and she asked if she would be permitted to return to active duty, he

said no because he knew she was pregnant. Finally, Austin's treatment of the other two pregnant

firefighters further demonstrated this animus.

The defendant attempts to make light of the plaintiff's claim of pregnancy discrimination,

by suggesting that discriminatory animus dissipates around the sixth month of pregnancy, but the

fact remained that the defendant demonstrated a clear unwillingness to accommodate <u>any</u> of its

employees until their pregnancies were so advanced as to make it not possible or practical for them

to be on the line – then work suddenly appeared for the pregnant firefighter.

Given this evidence, it is clear that a jury could conclude that the Town was motivated by

discriminatory animus and treated pregnant employees different than similarly situated male

employees, making summary judgment inappropriate in this matter.

- 45 -

E.    The Plaintiff's Retaliation Claims Survive Summary Judgment As The Plaintiff Has Established Sufficient Issues of Disputes Fact

At the outset, it must be noted that the defendant attempts to misconstrue the plaintiff's retaliation claims into claims for an "accommodation and "improper use of sick time." To the extent that those allegations form the basis of a claim, they do so only as part of the plaintiff's evidence of retaliation for opposing discriminatory conduct. Indeed, the plaintiff alleges examples of the retaliatory conduct which included its requirement that she continue to work in a light duty capacity when she should have been out of work on worker's compensation as well as the continued refusal to transfer her to a position in the fire department.

In many ways, the plaintiff's retaliation claims merge with her discrimination claims, since her allegation is not that the defendant's misconduct started because of her invocation of her legal rights, but that it *worsened*.

1.    Legal Standard for Retaliation

To establish a claim of retaliation, a plaintiff must plead and prove that: (1) she was engaged in an activity protected under Title VII; (2) her employer was aware of her participation in the protected activity; (3) her employer took adverse action against her; and (4) a causal connection existed between her protected activity and the adverse activity taken by her employer. Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001); Bolick v. Alea Group Holdings, LTD, 278 F. Supp. 2d 278, 284 n.7 (D. Conn. 2003). This standard is also applied to retaliation claims brought pursuant to C.G.S. § 46a-60(a)(4). Bolick, 278 F. Supp. 2d at 283. "Protected activity" for purposes of a retaliation analysis includes internal, informal complaints to management. Id. at 284, n.7. Additionally, "the causal connection needed for proof of a retaliation claim can be

- 46 -

established indirectly by showing that the protected activity was closely followed in time by the adverse action." Cifra v. G.E. Co., 252 F.3d 205, 217 (2d Cir. 2001) (internal citations omitted). The causal connection can also be shown by evidence of retaliatory animus. Bolick, 278 F. Supp. 2d at 284.

     2.     A Reasonable Jury Could Find Ample Evidence of Unlawful Retaliation

     The record reflects both direct and circumstantial evidence of retaliation. At the meeting on July 19, 1999, the plaintiff informed Austin that she was not happy with his decision to not provide her with an alternative assignment and she told him that she was going to consider legal action. In response to this comment, Austin stated that he would stop looking for work for her. (Def. Ex. 13, pp. 373-374) On August 9, 1999, the plaintiff did file a charge of discrimination with the Connecticut Commission on Human Rights and Opportunities and informed Laurie Murray of her actions on the day that she filed the complaint. (Def. Ex. 11, p. 134) Within days, she received an assignment — however that assignment was not within the Fire Department and at a lower rate of pay, despite the fact that traditionally those who were accommodated with light duty assignments suffered no loss of pay. (Pl. Ex. 6)

     Indeed, by all accounts, after the July 19, 1999 meeting Austin did not make any efforts to look for an assignment for the plaintiff within the Fire Department. For instance, as discussed above, and contrary to his testimony that he was "begging and pleading" for a position, other individuals only recall him mentioning the plaintiff's situation once and the Human Resource Specialist for the fire department, obviously the person in a pretty good position to help locate an alternative assignment, was never approached by Austin for her help in securing a position for the plaintiff. Indeed much of the further misconduct towards the plaintiff took place only after she

- 47 -

had invoked her legal rights.

From Austin's direct comments, and the timing of the events that followed, a reasonable jury could conclude that the Town's misconduct was motivated not merely by her sex and pregnancy, but by her threat to invoke, and ultimate invocation of her legal rights. Thus, there are sufficient facts from which a jury could find for the plaintiff on her retaliation claims and, summary judgment on this basis must be denied as well.

## IV.    **CONCLUSION**

For the foregoing reasons, the defendant's motion for summary judgment must be denied in its entirety.

Respectfully submitted,

Deborah L. McKenna  ct17326
Gregg D. Adler ct05698
Ruth L. Pulda ct05697
Livingston, Adler, Pulda, Meiklejohn
   & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922
(860) 233-9821

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment has been mailed first-class, postage pre-paid on this 18th day of November, 2003 to the following counsel of record:

James M. Sconzo
Kristi E. Mackin
Halloran & Sage, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103-4303

Jennifer Bullock Majewski
Assistant Corporation Counsel
Town of West Hartford
50 South Main Street
West Hartford, CT 06107

Deborah L. McKenna